# Court of Appeals.

*November,* 1887.

## PEOPLE v. SHARP.

(Reversing 5 *N. Y. Crim. Rep.* 388.)

BRIBERY—PENAL CODE, PROVISIONS OF, AS TO—LEGISLA-
TIVE INVESTIGATIONS — EVIDENCE — PRIOR CRIME—
MENTAL CONCLUSION OF WITNESS—FLIGHT OF CO-
DEFENDANT.

The defendant, prior to the finding of the indictment herein, was subpœnaed
before a committee of the Senate appointed to investigate, among other
things, the methods of the Broadway Railway Co., in obtaining, and the
conduct of the aldermen of New York city in granting the consent to
the construction of said railway, and he testified under oath before such
committee, in response to questions in their behalf, without protest or
objection on his part. Subsequently, on the trial of this indictment for
bribing a member of the Board of Aldermen aforesaid, with intent to
influence his action upon the afore-mentioned application of said com-
pany for said consent, defendant's said testimony was, under his objec-
tion and exception, admitted in evidence, on behalf of the prosecution,
as admissions made by the defendant elsewhere against his interest.
Without this testimony, defendant claimed, on his appeal, a conviction
could not, or might not have been had. *Held,* that the admission of
such evidence was error, for which a new trial should be granted.

Such testimony before the Senate committee was given under § 79 Penal
Code, and was privileged, and could not be used against defendant on
the trial of said indictment.

Section 79 aforesaid is not unconstitutional in its compulsory provisions,
since it also contains a provision forbidding the use of the testimony
against the person giving it ; and it cannot be held that this protection
is insufficient because it does not prevent the disgrace and infamy of dis-
closure.

The Senate has full power to take cognizance of, and inquire, through its
committee, into alleged abuses of public power and corruption of public
officers, having in view the possibility of an alteration in the existing
law ; and such committee has power to carry the resolution appointing it
into effect, by compulsorily subpœnaing witnesses and examining them
under oath.

It is not necessary for the protection of a witness before such a committee that he should, either by deed or word, set at defiance, or refuse to obey the summons, or refuse to answer the questions of the committee, since both his appearance and testimony are compulsory.

The evidence of a witness before such a committee is given under the penalty of contempt proceedings, and his refusal to appear or testify is punishable as a misdemeanor under §§ 68 and 69 of the Penal Code.

Section 79, Penal Code, aforesaid, embraces such legislative investigations as are above referred to.

Under the recitals of the resolution appointing the committee aforesaid, the defendant was a witness before said committee "against another person," as those words are used in § 79 aforesaid : viz., against the Board of Aldermen.

That sections 68 and 69, Penal Code, make the refusal of a witness to attend or testify before a legislative committee, a misdemeanor, and limit the inquiry to material and proper questions, does not make improper a question which calls for a criminating answer.   Said sections do not exclude the operation of sections 78, 79, under which every question may be asked in such investigation, which is "pertinent" to the subject-matter.

Defendant was indicted for bribing, in 1884, one Fullgraff, an alderman, with intent to influence his official action, with regard to the Broadway Railway petition, and his defense was a denial of all connection with, or knowledge of the alleged payment to said Fullgraff.   Evidence was admitted, under defendant's objection and exception, tending to show an attempt made by him in 1883, to bribe one Pottle, an engrossing clerk in the state legislature, to make a change in the language of a bill then pending, so that its terms might authorize the construction of a railroad in Broadway. No issue as to good character was tendered by the defense.   The trial judge charged that the jury were to consider such evidence, only "as showing the zeal which defendant exhibited," and as showing "the extent of defendant's interest, feeling and desire," and for no other purpose.   *Held,* that the admission of this evidence was error. not cured by the charge.

One Miller, an alderman, was called as a witness for the prosecution, and, under defendant's objection and exception, testified that after the "consent" to the building of the Broadway Railway was granted, by the aldermen, he was given $5,000 by one DeLacey, and that nothing was said as to what it was paid for.   In response to the question of the prosecution, "What did you think at the time, he gave it to you for?" which question was several times repeated in various forms, he finally answered, "I suppose it was for the Broadway road." It did not appear that Miller was a party to any agreement concerning the passage of the Broadway Railway resolution, and the transaction of the payment was not with the defendant. .  *Held,* that the admission of the mental conclusion of the witness as to the consideration of, or inducement to the gift, was error.

The prosecution, under defendant's objection and exception, were allowed to

prove that certain of the co-defendants, who were shown by the evidence to have been concerned in the crime, as intermediaries, or instruments of other guilty parties, were absent from the state, and were found, only after long search, in Canada, the prosecution offering this testimony affirmatively, as stated by them, for the sole purpose of showing due diligence, there being no claim that defendant was privy to their absence. *Held*, error, though not sufficient, if standing alone, to call for a new trial.

Appeal by defendant Jacob Sharp from a judgment of the General Term of the Supreme Court in the First Department, affirming a judgment of the Court of Oyer and Terminer of New York county, upon a conviction of defendant of bribery.

The facts fully appear in the report of the case at General Term, *ante, p.* 388.

*Albert Stickney*, and *W. Bourke Cockran*, of counsel for defendant appellant.

*Randolph B. Martine*, district attorney, *De Lancey Nicoll* and *McKenzie Semple*, assistants, and *Geo. F. Comstock*, of counsel for the people, respondent.

DANFORTH, J.—The indictment was found October 19, 1886. In substance it accuses Jacob Sharp, and six other persons, of giving and offering, and causing to be given and offered, to one Fullgraff, a member of the Common Council of the city of New York, twenty thousand dollars, with intent to influence him in respect to the exercise of his powers and functions as such member of the Common Council, upon the application of the Broadway Surface Railway Company for the consent of the Common Council to the construction of a street railway. Sharp was tried separately. Direct evidence was given from which a jury might find that Fullgraff had in fact been bribed, and other evidence altogether of a circumstantial character, and by no means conclusive, but sufficient, as the jury have said by their verdict, to warrant a finding that Sharp was concerned in the commission of the crime, and therefore guilty of the offense charged. Exceptions were taken on behalf of the defendant to several decisions of the trial court, in admitting against his objection certain items of

testimony, which it is conceded were material, and without which it is claimed by the appellant a conviction could not or might not have been obtained. First, among others, the counsel for the prosecution proved that the defendant was examined as a witness before a committee of the Senate of this state, appointed to investigate among other things, the methods of the Broadway Railway Company in obtaining such consent, and also the action in respect thereto, of the Board of Aldermen of said city, which granted, or of any member thereof who voted for the same, and that he upon that occasion gave testimony which the learned counsel for the prosecution claimed to be "irrefutable evidence of his participation and complicity in the commission of the crime." This testimony the prosecution offered in evidence. It was conceded by the prosecution that at the time he testified the defendant was before that committee under the operation and compulsion of a subpœna duly issued by the committee, and that the testimony he gave was in response to questions propounded in their behalf. Its admission on the trial was objected to on the ground that it was given under privileged circumstances; that the defendant was compelled to attend and testify; and that evidence thus elicited was not competent " upon the trial of a person where the subject under inquiry is that about which he was then interrogated."

The question before the jury was whether the defendant had committed the crime of bribery as alleged in the indictment and as that offense is declared by section 78 of the Penal Code, under which the indictment was found. This section forms part of title VIII, which relates to crimes against public justice, and of chapter I. of that title, concerning bribery and corruption. It is preceded by other provisions concerning bribery, as section 44, of an executive officer; section 66, of members of the legislature; section 71, of a judicial officer; section 72, of such an officer accepting a bribe; section 74, of a juror; and embracing all these, as well as the provisions of section 78, section 79 declares that, (1) A person offending against any provision of any foregoing section of this Code

relating to bribery, is a competent witness against another person so offending, and may be compelled to attend and testify upon any trial, hearing, proceeding, or investigation in the same manner as any other person. (2) " But," it declares, " the testimony so given shall not be used in any prosecution or proceeding, civil or criminal, against the person so testifying." (3) A person so testifying to the giving of a bribe which has been accepted, shall not thereafter be liable to indictment, prosecution or punishment for that bribery, and may plead or prove the giving of testimony accordingly, in bar of such an indictment or prosecution.

By a subsequent section (section 712 of the Penal Code) these provisions are so modified as not to forbid such evidence being proved against the witness upon any charge of perjury committed on such examination.

The first question upon this appeal is as to the meaning and spirit of the statute contained in this section (section 79). The appellant contends that by it the disclosures made by him before the Senate Committee, were privileged, and could not be used against him on the trial now under review, and one of the learned counsel for the people concedes that this force might be attributed to the statute, if it were wholly a valid enactment (as he contends it was not), and if the evidence given before the committee had not been entirely free and voluntary (as he contends it was.) These propositions lie at the bottom of the controversy.

1st. Is the enactment valid? The learned counsel for the people contrast the constitutional provision, " that no person shall be compelled in any criminal case to be a witness, against himself " (Art. I, section 6), with the compulsory words of section 79, already quoted, and pronounces one to be " the direct opposite of the other," and as we understand the argument, it is that the constitutional exemption is absolute and complete, permitting the witness to lock up the secret in his own heart, and does not permit the evidence to be taken from him at all; that this right is infringed by the provisions of section 79; and that it is therefore invalid. It

is, I think, an answer to this proposition that the same section declares not only that the testimony given by the witness shall not be used in any prosecution or proceeding, criminal or civil, against him, but that the very fact of so testifying may be pleaded in bar of an indictment or prosecution for the giving of a bribe which has been accepted.

It should be borne in mind that the sole object of the introduction of the defendant's testimony was to prove from it that he was guilty of giving the bribe, which, as the evidence tended to show, Fullgraff accepted, and the giving of which was the sole accusation against the defendant. If then the case is within the terms of the section, as upon this point it is assumed to be, the immunity offered by it distinguishes the statutory provision from the constitutional inhibition, inasmuch as it indemnifies or protects the witness against the consequences of his testimony. To that effect is the decision of the Court of Appeals in the case of People *ex rel.* Hackley v. Kelly (24 N. Y., 74). The court there had under review an order adjudging the relator Hackley guilty of contempt in refusing to answer before the grand jury questions quite similar in substance to those propounded to Sharp by the Senate Committee. The complaint under examination was against certain Aldermen and members of the Common Council of the city of New York for receiving a gift of money, under the agreement that their votes should be influenced thereby in a matter pending before them in their official capacity, and Hackley, as a witness, was asked as to the disposition made by him of a certain pile of bills received from one H., and said to amount to $50,000. Hackley asserted his privilege at common law and under the Constitution, and demurred to the question. The Court of Sessions adjudged him guilty of contempt for refusing to answer, and ordered him to be imprisoned. The Supreme Court affirmed the order and the Court of Appeals affirmed the decision. The principal question discussed by this court was whether the relator could lawfully refuse to answer the interrogatory, and in reaching its conclusion the court examined the provisions of chapter 539

of the Laws of 1853, entitled, "An Act to amend the existing law relating to bribery," and also chapter 446 of the Laws of 1857, amending the charter of the city of New York. Both acts relate to bribery. We shall again refer to them, and it is sufficient in this connection to say that each act contains provisions compelling the attendance and testimony of witnesses, but provides full protection against the use of their testimony in any proceeding, civil or criminal, against the person so testifying. The object of these provisions was said to be to enable the public to avail itself of the testimony of a participator in the offense and to enable either party concerned in its commission to be examined as a witness by the Grand Jury or public officer entrusted with the prosecution, and the court held that the relator was not privileged by the Constitution, inasmuch as he was protected by the statute against the use of such testimony on his own trial.

The learned counsel for the people also argues that the statutory protection afforded by section 79, does not go far enough ; that the indemnity it offers to the accused witness is partial and not complete ; that while it may save him from the penitentiary, by excluding his evidence, it does not prevent the infamy and disgrace of its exposure. This argument is also met by the opinion in the Hackley case (*supra*), It was there argued for the relator that he was not wholly protected ; that his testimony might disclose facts and circumstances, which being thus ascertained, might be proved against him by other testimony than his sworn evidence. But the answer of the court covered not only that supposed case, but the objection that the disgrace of exposure would still remain although the evidence was not used. "That," said the court, "is the misfortune of his condition, and not any want of humanity in the law." "If a witness," said Judge DENIO (24 N. Y., 83), "objects to a question on the ground that an answer would criminate himself, he must allege, in substance, that his answer, if repeated as his admission on his own trial, would tend to prove him guilty of a criminal offense," adding, "If the case is so situated that a repetition of it on a prosecu-

tion against him is impossible, as where it is forbidden by a positive statute, I have seen no authority which holds or intimates that the witness is privileged." The conclusion of the court was that the relator was not exempt from testifying, and it follows from the decision then rendered, that the provision of the Code which embodies the same conditions as those then under consideration, is in no sense repugnant to the Constitution.

2d. Was the testimony of Sharp given of his own will, or by compulsion? He would, as the prosecution concedes, have testified against himself, if as a witness on his trial he had sworn as he did before the committee ; but he was not sworn upon his trial and this fact they say left him to the operation of the common law rule, where his admissions made elsewhere and in another place were sought to be proved by other witnesses. To reach this conclusion it is argued with great earnestness by one of the learned counsel for the people, that "the resolution of the Senate and the inquisition of the committee were illegal and void proceedings, having no significance or force in the judgment of the law." " To say," continues the counsel, " that Mr. Sharp was a witness implies a court or magistrate authorized to administer the oath and the evidence," and his claim is that Sharp was " under no compulsion of law to be present at this inquisition, to take an oath, or to testify." In the view of the learned counsel for the prosecution and as characterized by him, " the sittings of the committee were merely meetings of private persons, among whom was Mr. Sharp." " There were," he says, " conversational questions and answers in which he " (Sharp) " took a part by answering interrogations addressed to him," and the contention of the learned counsel follows, " that " Sharp's " statements on that occasion may be used in any proceeding to which he is a party." If the premises were true, this constructions might in ordinary cases follow. But if they are correct, the courts below seem to have misconceived the situation in which Sharp was placed, for we cannot find in the voluminous record before us any suggestion that the

Senate had not full power to take cognizance of, and to inquire through its committee into the alleged abuses of public power and the corruption of public officers, nor that such proceedings in the present case, having in view the possible necessity of an alteration in the existing law, were not in every respect valid and legal. Nor are we left to this negative evidence that such question was not raised upon the trial. It appears by the concession there made and already quoted, that upon objection being made to the introduction of Sharp's testimony on the ground that his statements before the committee were privileged, made under compulsion of a subpœna and the constraint of an oath duly administered by the committee who confined his evidence to such questions as the committee chose to ask, the prosecution made the admission already set out, but requires the resolution under which the committee assumed to act to be put in evidence and be connected with the admission. That being done, the prosecution went into evidence of the acts of Sharp, to show that he waived his privilege before the committee by not asserting it, in no manner questioning the due appointment of the committee nor its powers. In view of these facts it is too late to raise the question here. Moreover, the decision in the case of the People *ex rel.* McDonald *v.* Keeler (99 N. Y., 463, 3 N. Y. Crim. Rep. 348), establishes, so far as this court is concerned, that the Senate had constitutional power to pass the resolution, that its committee was authorized to carry it into effect. In that case it appeared that charges of fraud and irregularity had been made by the public press and otherwise against the Commissioners of Public Works in the city of New York, and the Senate by resolution directed its committee " to investigate " that department, with power to send for persons and papers and report the result of its investigation and its recommendations concerning the same to the Senate. The relator was summoned and appeared, and testified, but refusing to answer certain questions, was, on the report of the committee committed by the Senate for contempt. Upon habeas corpus, questions as to the constitutional power of the Senate to order

the investigation and the legality of its proceedings were distinctly presented and affirmed.

The case on which the learned counsel for the people now places his argument (Kilbourn v. Thompson, 103 U. S., 176), was cited in favor of the prisoner, fully commented upon by the court, and shown to have no application. The action of Congress reviewed in that case, was in substance a creditor's bill, or effort to impeach a transaction already closed between the United States and one of its debtors. The Supreme Court of the United States held that as to it, Congress had no judicial power, and exceeded its authority in the attempted investigation. The McDonald case on the contrary, reviewed a proceeding which was necessary or appropriate to enable the Legislature to perform its functions and it was held to be no objection that it partook in some degree of a judicial character. That case brought up proceedings on all substantial points, like the resolutions which were at the bottom of the inquiry before the Senate Committee in this case, and its decision makes any further discussion of their validity quite unnecessary. It follows that the investigation before the committee was not beyond its powers, nor were the resolutions under which they acted void, nor without legal significance or force. As therefore it cannot be said that the committee was without power to compel the witness and require his testimony, the respondent must find elsewhere reasons, if there are any, in support of the proposition that the evidence was by a willing witness. To that end it is further said in behalf of the people that Sharp by not asserting his privilege before the committee, waived it. But if the case comes within the purview of section 79 (supra) of that act, the Senate subpoena and the resolution of the Senate were compulsory, and it was not necessary for the protection of the witness that he should either by deed or word set either at defiance, or refuse to obey the summons or refuse to answer the questions of the committee. It is enough if he was obliged by law to answer the inquiry, and he could not be required, in order to gain the indemnity which the same law afforded, to go through

the formality of an objection or protest which, however made, would be useless. In the Hackley case (*supra*) the witness did plead his privilege, but it was of no avail, because he was obliged by law to answer the inquiries and the law was held imperative and sufficient, although the case was one within the very terms of the Constitution, because by the same law he was protected against the consequences of his admissions. Whether he asserted his privilege, or whether he was silent and submissive to the laws, could make no difference. The Legislature, for reasons of public interest, required a discovery of the whole truth as to matters involved in their inquiry, and one answering in compliance with their command cannot be deemed a willing or consenting person within the meaning of the maxim, " volenti nonfit injuria," on which respondent relies. A person who yields from the necessity of obedience cannot be said to have the power of acting by his own choice And where the law says he shall be compelled to attend and shall be compelled to testify, acquiescence is not election and he is not one of whom it can be said, he receives no injury from that to which he willingly and knowingly agrees and consents. There can be no volition where there is neither power to refuse nor opportunity to elect. Under such circumstances the witness must be deemed to speak for the safety of his person, and in view of the indemnity which the law promises. A man is none the less robbed because, yielding to irresistible power, he makes no resistance, and a witness who gives up his secret at the command of the law, is as much under compulsion as if he ventured on the punishment that would follow on his refusing to disclose it. In the Hackley case there was the plea of privilege, but it availed nothing because the law required an answer. The position of the witness was in no respect changed by the plea. In the Keeler case (*supra*) there was refusal to answer under the advice of counsel, but availed nothing. It seems to us that the evidence of Sharp before the committee was given under the penalty of commitment and imprisonment for contempt, and consequently that it was obtained from him by compulsion.

To refuse to attend the committee or testify would, moreover, have rendered the witness guilty of a misdemeanor, §§ 68, 69 Penal Code. So far, we have assumed the case to be within the provisions of section 79 of the Penal Code (*supra*), and we come now to the contention on the part of the people that the section (79) does not embrace such investigation, but on the contrary is to be limited to such testimony only as might be given upon trial, hearing, proceeding or investigation in the course of a criminal prosecution, and that it has no application to such testimony as might be given in the course of legislative proceedings or investigations. It was held in *People* v. *Keeler* (*supra*) that the Senate might proceed in its own way in the collection of such information as might seem important in the proper discharge of its functions; and whenever it was deemed necessary to examine witnesses, the power and authority to do so might properly be referred to a committee with such powers as might appear to be necessary or expedient in the case, and that notwithstanding the vesting of judicial power in the courts, certain powers, in their nature judicial, belong to the Legislature and might be delegated to a committee authorized to take testimony and summon witnesses, and that a refusal to appear and testify before such committee, or to produce books or papers, would be a contempt of the House. It was also held that when institutions or public officers were ordered to be investigated, it is to be presumed that such an investigation is with a view to some legislative action in regard to them, and moreover, that the terms of the resolution directing it may be looked at to ascertain the legislative intent. The resolutions which led to the examination of Sharp were passed January 26, 1886. They were preceded by a reference to the provisions of the Constitution and statutes relating to street railroads, and the prohibition against such road without "the consent thereto of the local authorities having control of the street upon which it was proposed to construct the road," and a reference to the charges that consent to the railroad upon Broadway, "was obtained through fraud and

by and through corrupt influence and bribery of such authorities," viz: the Aldermen of the city of New York, and a recital that a strong and reputable sentiment in that city demands at the hands of the Senate, " an investigation of the methods in obtaining such consent." It was for these reasons resolved by the Senate that its railroad committee be authorized " to investigate fully all matters relating to the methods of the Broadway Surface Railroad Company, or of any other person or corporation relating to, or in obtaining such consent, and also to investigate fully the action of the Board of Aldermen of said city, which granted or gave the same, in respect thereto, or of any member thereof who voted for the same, in respect thereto."

The committee were given full power to prosecute such investigation in such directions as it thought necessary, to all matters relating to the granting of said consent and the inducements which led thereto, with full power to send for persons and papers, and to employ counsel and other assistants in the work before them, and the Sergeant-at-Arms was directed to attend the sittings of the committee, serve subpœnas, and do such other things as it directed. A report was required, with recommendations, and particularly as to the policy of an amendment to the Constitution, vesting the power to grant such consent in some other authority than as at present provided. It is apparent from their terms that the resolutions which permitted the examination of Sharp, involved an inquiry which the Legislature had a right to make and which in view of the recitals in the resolution it was its duty to make, in order that the abuses which were disclosed might be cured by further action by the Legislature or by the people. The inquiry was judicial in its nature, was to be pursued for a lawful end and by means as comprehensive and sufficient as could be provided. The occasion and the action of the Legislature meet every suggestion of the court in the case last cited as to the expression of legislative intent and the imposition of of the duty of obedience upon all persons who should be summoned to make, by their testimony, the investigation serve

the ends of public justice. We have seen that there is no conflict between the will of the Legislature as expressed in section 79, and the Constitution, and we are now to construe that section in accordance with the legislative intent. In its exposition full effect is to be giving to that intention, and if possible full force and validity to every word, so that no part be annulled or rendered nugatory. It cannot be doubted that the case is brought literally within the language of the section (79, *supra*). Sharp was a person offending against one of the specific provisions of the Code in relation to bribery. He was accused, and has been convicted of giving a bribe. He was therefore qualified under that section (79), as a " competent witness." Against whom? Why, against another person " so offending," that is, another person offending against any of those provisions of the Code " relating to bribery." He was in fact a witness before the committee in relation to bribery. Was he a witness against another person? The resolution recites as the immediate cause of the action of the Senate, the alleged bribery of certain " local authorities consenting to the railway," and then to make the accusation specific as to the person, says, " the local authority," referred to, as the authority which consented, " was the Aldermen of said city." There was then another person offending. Sharp was by the statute made competent as a witness as to the subject matter against him. The Legislature may be presumed to know that such a person, although made by law competent as a witness against that other person, would even then testify, if at all, voluntarily and to his own crime, and therefore would not be likely to testify at all, and so they not only make him a competent witness, but add, " and " (he) " may be compelled to attend and testify," meaning, of course, to give evidence against that other person, including at any rate the other party to the transaction. If, as in the case before us, the " person offending" is the giver of the bribe, then he might be compelled to testify against the receiver of the bribe. Where? Why, upon any trial, upon any hearing, upon any proceeding, " or upon any investigation." It follows that if we adhere to

the ordinary and natural meaning of these words and apply them to the case in hand, we shall find neither inconsistency nor incongruity, but complete adaptation. The Senate was dealing with the charge made against the Aldermen of the city, that their consent was obtained by and through certain methods, and among others, bribery; it admitted that an investigation of those methods was demanded; therefore the Senate authorized its committee "to fully investigate" all matters relating to these methods, and also to investigate fully not only the action of the Board of Aldermen which granted or gave such consent, but also that of any member of the Board, with full power and authority "to prosecute its investigations in any and all directions in its judgment necessary to a full and complete report to the Senate as to all matters relating to the granting of such consent and the influences and inducements which led thereto," and gave to the committee full power and authority to send for persons and papers, to to hold its sessions in New York and conduct its "investigations" there. Clearly there is to be an investigation, in the language of section 79, of a charge of bribery of a public officer, with an intent to influence him in the exercise of his powers. The committee were to ascertain through testifying persons and papers, whether the charge was well or ill founded. Whoever gave evidence before them attended upon an "investigation" and testified, and unless we greatly confine and limit the meaning which the words used by the Legislature usually express, it is impossible to say that the case is not within the statute. It is claimed, however, by the learned counsel for the people, that the "investigation" in the mind of the Legislature did not include an investigation directed by itself and conducted through its committee, but only an "investigation" in the course of a criminal prosecution, and upon that construction the judgment of the court below was put. It is no doubt the duty of the court to restrain the operation of a statute within narrower limits than its words import, if it is satisfied that giving to them their literal meaning, the statute would be extended to cases which the Legis-

lature never intended to include. But this can only be done where a reason for some limitation is found, either in the occasion in which they are used, or in the context. That is not the case here. In the first place the construction contended for in behalf of the people is contrary to the plain and ordinary meaning of the words used. " Any investigation" would include all investigations in the conduct of which persons may be called by authority as witnesses to testify under oath concerning any matter. Therefore it must include, if taken literally, the action of a legislative committee according to the direction given it, and acting with authority to subpœna witnesses, and enforce their attendance, and examine them upon oath. Nor is it any answer to this conclusion to say that only a judicial investigation was intended. If we are right in the views above expressed, the Legislature possessed, and might delegate to its committee, any power short of final judicial action, which they thought necessary in any particular case, and although the investigation was only for the collection of information required for the proper performance by the Legislature of its own functions, it might nevertheless, be a proceeding requiring witnesses and power to compel their attendance. It is, moreover, assumed and claimed by the prosecution that the privilege of a witness to be exempt from a compulsory disclosure of his own criminal conduct, is the same in such an examination as when sworn in court. If that be so, it affords a sufficient reason for including a legislative investigation among the proceedings in which persons otherwise privileged, should be compelled to testify. Public policy might often require the fullest disclosure, and the very case before the Legislature was an instance in which that policy might be defeated, if the utmost latitude was not permitted and the greatest freedom of examination to ascertain the truth of the public charge that a great and valuable franchise had been obtained through corruption and bribery of public officials. *In re* Falsey (7 *Wisc.*, 630), it appeared that in pursuance of a resolution of the legislature of Wisconsin, not un-

like that before us, having for its object the investigation of frauds, bribery and corrupt acts charged to have been perpetrated by inducing the Legislature to grant certain lands, and the investigation of cases of alleged bribery on the part of certain railroad officials and others in procuring the grant, a committee was appointed with powers similar to those conferred by the resolution before us. One Falsey was subpœnaed before the committee, but refused to answer, and on habeas corpus it was adjudged that he could claim no privilege, and his refusal to answer was a contempt, because the law of that state provided that no person so examined and testifying before a committee so appointed, should he held to answer in any court of justice, or be subjected to any penalty or forfeiture for any fact or act touching which he should be required to testify. It was held that this language furnished a full protection. No such provision relating to the offense of bribery is found in any statute of this state prior to 1869 (ch. 742, Laws 1869), but the legislation on the subject extended from time to time, until consolidated and enlarged in the Penal Code. The provisions of the Revised Laws (Vol. 2, p. 191, sec. 3) were made part of the Revised Statutes (Rev. St., Vol. 2, t. 4., pt. 4, ch. I, Art. 2, § 9, p. 682), and related to the bribery of certain State officers, judges of any court of record and judicial officers. Section 10 of the same article related to the acceptance of a bribe by either of these officers; section 11 related to the acceptance of bribes by jurors, arbitrators and referees, and section eleven to persons who should by gifts corrupt or bribe them.

In 1853 (Laws 1853, ch. 217. § 14), by the act amending the charter of the city of New York, and above cited, a penalty was imposed for bribing any member of the Common Council or other officers of that corporation, and it was provided that every person offending in that respect should be a competent witness against any other person offending in the same transaction and might be compelled to appear and give evidence before any grand jury or in any court in the same manner as other persons, but declared that "the testimony so given

should not be used in any prosecution, civil or criminal, against the person so testifying." In the same year (Laws 1853, ch. 539) the provisions of the Revised Statutes (ante) were amended and added to; other officials were enumerated as the subjects of bribery, and among them " any member of the Common Council or corporation of any city," and any person offending against either of the provisions of the preceding sections, was declared to be a competent witness against any other person so offending, and might be compelled to appear and give evidence before any magistrate or grand jury, or in any court, in the same manner as other persons, but it provided that testimony so given should not be used in any prosecution or proceeding, civil or criminal, against the person so testifying."

The act of 1857 § 52, *supra*) is confined to the city of New York, and relates only to bribes offered or given to members of its common council or officers of the corporation, makes every person offending against any of the provisions of that section a competent witness against any other person offending in the same transaction, and closes with an absolution or saving clause similar to that of the Act of 1853. last cited.

In 1869 (Laws 1869, ch 742) an act was framed for " the more effectual suppression and punishment of bribery." It authorized certain actions in favor of parties injured, and by section 8 provided as follows : " No person shall be excused from testifying on any examination or trial for any offense specified in this act, or the trial of any action authorized by this act, or on any investigation by any committee of the Legislature, or either house thereof, into the conduct of any member thereof, or on the trial of any civil action for slander or libel, or any criminal action for libel, where such alleged slander or libel imputes bribery, or any offense mentioned in this act, or on the trial or examination of any charge of perjury, committed in evidence given upon any such trial or investigation, on the ground that his testimony will tend to disgrace him or render him infamous, or will tend to convict him of a criminal offense, or render him liable to be proceeded against therefor.

But the testimony given by such witness on such trial or investigation shall not be used against him on the trial of any action, civil or criminal, against him. And nothing herein shall be constructed as compelling any person to testify in any proceeding or trial in which such person is charged with crime."

Keeping in mind the compulsory and the protecting parts of the foregoing statutes, we come to the statute of 1881, ch. 677, which establishes a Penal Code, and which, so far at least as the crime and proof of bribery is concerned, is in part a codification of preceding enactments. So far as the various provisions of these acts make the offender a competent witness and relieve him from prosecution, they are formulated in section seventy-nine, already quoted (Penal Code 79). It is apparent from this history of progressive legislation that the word "investigation" cannot be treated as a word of mere amplification to broaden the sense of preceding words, but must be deemed the deliberate expression of an intent on the part of the Legislature to bring in a distinct class of cases. Can there be any doubt as to the meaning of the Legislature in the corresponding clause of preceding statutes? In that of 1853 (ch. 217), requiring the party to give evidence before "any grand jury in any court," or in chapter 539 of the same year, "before any magistrate, grand jury or in any court," or in the act of 1869 (*supra*), "on any examination or trial," or "on any investigation by any committee of the Legislature, or either house thereof, into the conduct of any member thereof." Each successive statute goes further than the preceding; one not including an examination before a magistrate, another including it, both obviously confined to examinations in the course of criminal procedure; but the last (1869) bringing in a new species, that of legislative investigation for a certain end and of a certain described class.

But other investigations than those relating to the conduct of its members were frequently entered upon or ordered by the Legislature to be made through its committee, in pursuing which, testimony from witnesses was required, and we see

no reason to doubt that the Legislature intended by the pro-
visions of § 79, to cover all such cases, as well as those formerly
provided for, when they involve an inquiry into matters
relating to bribery as defined by the various sections of the
the Penal Code above referred to.    The plain object of that
statute was to enable these various tribunals, whether magis-
trates, grand juries, courts or Legislature, to make their
investigations into alleged abuses effectual, and enable them
to prosecute their inquiries successfully, and to that end pro-
tect witnesses whose testimony might otherwise be withheld,
but without which the investigation would fail.    No reason
has been suggested for confining that protection to witnesses
other than those who appear upon legislative investigations,
and we are not permitted by any rule applicable to the con-
struction of statutes to give the section in question such
limitation as will exclude them.    It could only be done by
inference and by importing into the statute, words which the
Legislature did not choose to employ, and which express a
meaning very different from the words actually used.    This
we are not at liberty to do.    " What else," asks a learned
Judge, " is restraining by inference or varying by interpreta-
tion, but to a certain extent recasting and remodelling the
the statute, or in other words, invading the province of the
Legislature itself?" (WILLIAMS, J., in Garland v. Carlisle,
4 Clk. & Fin., 726). It certainly should not be permitted
where the object of the act under examination was to extend
the policy of existing statutes to new cases, and enlarge and
not restrain its application, nor where the intention of the
Legislature is clearly expressed in words, deliberately chosen,
and where a literal construction does not take them beyond
the mischief at which they were aimed.    The case before us is
not only within the words, but within the spirit of the statute,
and we are unable to find any doubt or ambiguity in its
language which should deprive the defendant of a construc-
tion according to the manifest import of the words actually
used.

We have not overlooked the contention of the respondent

" that sections 68 and 69 of the Penal Code, making the refusal of a witness to attend or testify before a legislative committee a misdemeanor," limits the inquiry to " material and proper questions," nor the argument thereupon that a question which calls for a " criminating answer " is not a " proper " question and the witness not obliged to answer. But we think that whatever effect may be given to those sections they cannot be regarded as excluding the operation of the subsequent sections (78, 79) which deal with the offense of bribery and provide with minuteness for its punishment and the means of its discovery. The actual attendance of the witness, and the disclosure are provided for and it is clear that to make an investigation upon the subject of bribery effectual there must be some way of compelling both. Within the scope of those sections, every question may be asked which is " pertinent " " to the subject matter, and whether it is or not will be the only question. The statute relieves the witness, and it will not be necessary for the examining or investigating tribunal to concern itself with the effect upon him. If this were not so, the whole object of the Legislature might be obstructed by the neglect or refusal of witnesses to obey the subpœna or answer the questions of the committee. That those put, on the investigation, the results of which are now before us, were pertinent, is apparent from the use made of the answers thereto upon the prosecution of the person who then testified. If the observations already made are correct, it follows there was error in receiving them against his objection.

Second.—Another exception brings up the ruling of the court as to evidence from one Pottle, proving a corrupt proposal by the defendant in 1883. The witness was at the time engrossing clerk of the assembly, and the defendant desired an alteration of a certain bill then pending before that body, so that its terms might authorize the construction of a railroad on Broadway. For this alteration he proposed to pay the witness $5,000. We are unable to find any ground on which the evidence was admissible. It was introduced as part

of the affirmative case which the prosecution were bound to carry to the jury. Its admission is justified upon this appeal by various propositions presented by the people. First. " We suppose," say the learned counsel, " we suppose that every criminal trial begins with a presumption of innocence in favor of the accused. This presumption must be founded on the moral rectitude or fear of the law, or both, whichever the person is supposed to possess. The presumption must be overcome before conviction, can be had. Jacob Sharp was accused and brought to trial for bribing the Aldermen of the City of New York, and by that means procuring the grant of a valuable right. Evidence was offered to show that not long before he had attempted to bribe another official person to do an act, which, as he thought, would promote the scheme which he had so long pursued. This evidence being given proved beyond a question that no sense of right and wrong, no fear of law or punishment, would deter him from committing the offense of bribery for the one purpose which he had in view in all his efforts." * * " The evidence objected to proved the irresistible strength of the motive as against all other motives which might have deterred him and upon which the presumption of innocence is founded." The commission of a crime by Sharp in 1884, was distinctly in issue. It was bribery, but the subject was Fullgraff, a member of the Common Council. Of the commission of that crime the law presumed Sharp to be innocent. If Sharp had given evidence of good character the prosecution might have answered that evidence by proof that his character was bad, but I believe it has not been thought by any judicial tribunal that such evidence could be given in anticipation of proof from the defendant, nor than an issue upon it could be tendered by the prosecution. *People* v. *White*, 14 W., 111 ; *Webster's Case*, 5 Cush., 295 ; *De Witt* v. *Greenfield*, 5 Ohio, 227 ; *Commonwealth* v. *Hopkins*, 2 Dana, 418 ; *Burrall on Circumstantial Ev.*, 533. But even in the case I have supposed such evidence would be of general reputation only, and not of particular acts by which reputation is shown. The effect

of the argument for the people is, that the evidence shows a disposition to commit the crime, that is, a criminal disposition. If that is a different view, it is equally inadmissible. A man's general character may perhaps be so bad as to permit an inference that evil and good have to him the same meaning, and that it is a matter of indifference by which he accomplished his purpose. In a judicial proceeding, however, proof of that would be irrelevant, although it might show in a moral sense that he would be likely to commit the crime with which he was charged. The person charged might as well seek to repel the imputation by proof of particular acts performed by him at other periods of his life, and a cause submitted to a jury be made to turn upon the preponderance of proof, on one side of antecedent bad conduct, and proof on the other of virtuous acts. Legally speaking it would be unsafe to draw a conclusion from either. We are referred to no case holding that upon the trial of an indictment charging a specific crime committed in a specific way, evidence that the accused was of a particular character would be relevant. Moreover, counsel on both sides seem to agree that the commission of one crime is not admissible in evidence on the trial of the same offender for another crime. It is indeed elementary law that no evidence can be admitted which does not tend to prove the issue joined, and the reason and necessity are much stronger in criminal than in civil cases for the observance of this rule and of confining the evidence strictly to the issue. The indictment is all that the defendant is expected to come prepared to answer. Therefore, the introduction of evidence of another and extraneous crime is calculated to take the defendant by surprise and do him manifest injustice by creating a prejudice against his general character. How then is this case to be taken out of this general rule of law? The learned judge in submitting the case, desired the jury to consider the Pottle evidence " as only showing the zeal which the defendant exhibited, " and not allow themselves to be prejudiced by his testimony in regard to the offer of a bribe, saying, " It is only to be con-

sidered as showing, like other evidence in the case, the extent of the defendant's feeling, interest and desire," adding, " I should be sorry if the fact that Pottle testified to the offer of a bribe, should be otherwise considered. So far as it tends to throw any dark shadow upon the character of the defendant, I desire you to eliminate it from your consideration and treat it merely as evidence tending to show depth of interest, motive and desire." These remarks not only answer the respondent's argument, but point to the danger which might follow from the evidence. They were obviously inadequate to prevent it. Nor does the discrimination between crime proven and a conversation, make the evidence less objectionable. As presented to the jury it was distinctly a crime committed. The point of inquiry was that, and it was plainly so avowed by the counsel for the people. He brought the witness Pottle and Sharp together; proved by him that he then had the " General Surface Railroad Act " in his possession as engrossing clerk; that he had a conversation with Sharp " in relation to the bill "; that he had a conversation with him " on the subject of the bill including or not including Broadway as one of the streets in the bill. " Then asked, " Had you any conversation with him as to whether he did or did not desire to have Broadway included as one of the streets in the bill. " The defendant's counsel objected, but the objection was overruled and an exception taken, and the witness replied, " I did. " He was then asked to state "all he (Sharp) said on the subject, " and the counsel for the defendant asked " to be informed to what point the evidence is to be directed, " saying, " there is a particular purpose in this question and I think we might properly be advised what it is. " After some discussion the district attorney said, " I intend to prove that Pottle was sent for by this defendant; that he went to defendant's room; that this defendant thereupon offered Mr. Pottle the sum of $5,000 to add to one of the sections of that bill the words Broadway and Fifth Avenue; permitting a horse railway company to be constructed upon those streets; that Pottle declined the pro-

position and that Sharp then offered the same sum in case he would give him the original bill; that is what I desire to prove"; whereupon defendant's counsel said, "we object to it upon the ground that it is evidence of an utterly distinct charge of crime." The court said, "Upon the whole, my judgment is that the evidence is admissible."

A careful examination of the evidence given by Pottle authorizes the comment of the appellant's counsel that "it was not part of the conversation, but that it was the "whole." Unless admissible as proving an attempt to commit a crime it is wholly immaterial, and as proof of a crime it was irrelevant and must have been very prejudicial to the defendant. It showed a capacity or willingness to commit bribery in 1883, to induce an act from which Sharp might be benefited as one desiring the construction of the road, but which in fact gave him no advantage over other citizens. It gave him no franchise; but it could not fairly be inferred from such premises that in 1884 he did also bribe a different person for a different purpose. The inference would be purely conjectural. The mental ability and disposition of the defendant to commit a crime of this sort, while it might persuade a jury, raises no legal presumption It is not moral evidence even. The fact under investigation in its circumstances, was entirely unlike the fact disclosed by the witness. There is no analogy between them. Yet the inference drawn by the prosecuting officer and permitted by the court, left it for the jury to say that the desire of Sharp manifested by the offer of a bribe in one instance, was the same desire which led to the actual giving of a bribe in the other, hence that the two crimes had the same origin. Evidence of moral character is admitted to disprove the existence of a criminal motive, or to rebut evidence of it, but evidence of a prior crime can have no legitimate place in an investigation as to whether a subsequent crime was committed by the same person. If it had been proven that Sharp had in fact given the money to Fullgraff, and the question was as to its being an innocent or criminal act, a gift which he had a right to make or

38

which he made corruptly, the fact, if it were a fact, that he sought to obtain a similar end by bribery, might seem to show the intent with which the act charged was done. But here the very thing in dispute was whether he gave the money, and that upon a former and different occasion he had offered money with a guilty purpose to another person, could not fairly be held as relevant to that question. Moreover, it had been distinctly conceded by the defendant that he desired to secure the franchise for the Broadway Surface Railroad, and therefore evidence of his commission of a crime for the mere purpose of showing that desire, was wholly unnecessary, and we may repeat here the language of ALLEN, J., in the Coleman case (55 N. Y., 81), upon a similar question: "It was idle and frivolous to put in this evidence for the purpose avowed, while its influence could not be otherwise than damaging to the prisoner." It was put in near the beginning of the trial, and the impression then made must have continued with the jury and in their minds colored and deepened if it did not distort the subsequent evidence. It did indeed cast a dark shadow upon the defendant's character; it not only tended very strongly to prove the defendant guilty, it was absolute proof, but it was of a different crime from that charged. It was offered and received directly on the main issue and was of great and persuasive force against him. Such evidence is uniformly condemned as tending to draw away the minds of the jurors from the real point on which their verdict is sought and to excite, prejudice and mislead them. It was, we think, improperly received, and the exception to its admission well taken.

Third.—We are also of opinion that there was error in the examination of the witness Miller. He was an alderman at the time of the passage of the resolution, but we do not find he was a party to any agreement concerning its passage. Against the objection of the defendant he was allowed to testify that after the "consent" was given he received from DeLacy $5,000. The district attorney then asked,

" You understood, did you not, that you received that money from DeLacy on account of the Broadway Surface Railroad?" Answer : " No, sir, nothing of the kind." A further examination as to the circumstances and the time of its receipt followed, and the witness said : " DeLacy gave me a roll of bills, and said there is something to buy election tickets with." Asked by the district attorney, " Did you not understand at the time, it was paid on account of the Broadway Railroad Company?" Answered : "No, sir ; I had no understanding of that kind with him." Question : " What was your understanding at the time ?" To this question there was not only the specific objection that the evidence asked for was incompetent against Sharp, but the further objection that it was asking for a conclusion. The court allowed it and the defendant excepted. Answer : "There was no particular understanding about it so far as I was concerned. There was nothing said about it." Question : " What did you think, at the time, DeLacy gave it to you for?" The court held this competent. Witness : " What did I think ?" District Attorney : " That is the question asked you," Answer : " About what ?" District Attorney : " As to what DeLacy gave it to you for ?" Answer : " Well I had my misgivings." District Attorney : " Tell us what you did think, at the time, what he gave it to you for ?" " I suppose it was for the Broadway road." It is quite impossible to find any ground on which the exception taken can be overcome. The transaction was not with Sharp. The question called for no fact, but with frequent iteration for an opinion, a supposition. Its importance in the estimation of the people is manifest from the repeated and persistent attempts to obtain it. The court below were of opinion that the ruling was erroneous, but that the jury could not have given any effect whatever to the mere expression of opinion, or supposition of the witness, because the whole transaction between DeLacy and the witness was afterwards given. It was, but the narration also was received under an objection and was excepted to. It certainly did not cure the difficulty. The question to

be settled was whether the money was part of the fruits of a corrupt agreement, whether the transaction was an incident of the scheme with the formation of which the defendant was charged, whether the alleged fact of bribery was true, and this like any other question of fact was to be settled by evidence. The opinion, the thought, the understanding of the witness was not evidence.   The jury might, however, naturally reason that the conclusion of the witness drawn from all the facts within his own knowledge, fairly represented the nature and the extent of the connection between the circumstance to which he testified and the fraudulent practice which had preceded it.   It was admitted because thought relevant and material by the prosecuting officer and the court, and whether in any, or in what, degree it did affect the jury, cannot be known. The payment of a large sum of money to the witness was a palpable fact.   Whether it was paid to him in his capacity of Alderman, or in connection with, or on account of, the consent obtained from the Board of Aldermen, could not properly be answered by the jury upon the suspicion or conjecture of the witness.   That it was not so answered we cannot say.   The respondent's counsel, however, the District Attorney, argues that the question was proper, but that the answer was not responsive.   The interlocution between the witness and the prosecutor seems to indicate that there was no misapprehension on the part of the witness, and that the answer was the answer called for by the question, and directly fitting to it.   The learned counsel did not stop his examination after proving the receipt of the money, but sought the mental conclusion of the witness as to the consideration of or inducement to the gift, and the answer was accepted by him.

Fourth.—The public prosecutor, to make out the case, and as part of his evidence in chief, offered to show by a detective officer that he had been employed by the district attorney to serve subpœnas upon Moloney, Keenan and De Lacy, all of whom the district attorney claimed to be material and competent witnesses, and to show further that the detective was

unable to find them in this state, but did find Moloney in Canada, and there served him with a subpœna and learned that the others were in Canada also, although he did not see them. These persons were named in the indictment as co-defendants with Sharp, and the evidence already adduced tended to show that some of them, and especially Moloney, were intermediaries between the persons offending against the provisions of the statutes relating to bribery, or instruments of whoever committed the act charged.

The evidence was objected to by the defendant's counsel, but admitted. It was not claimed by the prosecution that the defendant was privy to their absence, or that the object of the proof was to furnish a basis for evidence otherwise inadmissible. The learned district attorney disclaimed any intention " of proving the flight of these persons as co-conspirators," and so make use of their absence as evidence of guilt, or an admission by their conduct that the accusation against them and the defendant was true, but said he offered it only for the purpose of showing that after diligent effort he was unable to procure their attendance as witnesses, and thus enable him to account for their absence. His claim is, that they were depositories of the direct proof of the conspiracy which the prosecution were engaged in establishing, and accomplices of the defendant. The evidence already in was, so far as Sharp was concerned, altogether circumstantial, but tended to show that the persons named or some of them, were qualified from actual knowledge to give evidence bearing more or less directly upon the very point in issue. We think the evidence of their absence was inadmissible. It could have no legitimate bearing upon the issue, and the danger is very great that such testimony will prejudice a party against whom it is offered. It may be, and frequently is admissible in answer to evidence from the other side which would naturally call for an explanation. But the absence out of the jurisdiction of the court of an associate, or one seemingly connected with the defendant in the act charged, is easily construed as evidence of guilt, and unless the occasion

calls for such proof it should not be allowed. It is an old
maxim that "he confesses the fault who avoids the trial,"
but in this application, even to the fugitive, there is great
danger of error. A man may avoid the trial from many mo-
tives besides consciousness of guilt, but however actuated,
his conduct can in no degree in a court of justice reflect upon
another. Its admission in this case was virtually saying to
the jury "there is better evidence and it might be had from
the defendant's associates; it is not the fault of the prosecu-
tion that the evidence is not before you, but because of the
voluntary act of those who with the defendant stand charged
with the offense." Thus the non-production of the witnesses
is made to supply the place of proof of the issue; with that
issue the evidence had no possible connection. The rule is
that where a party to an issue on trial has proof in his power,
which if produced would render material but doubtful facts
certain, the law presumes against him if he omits to produce
it and authorizes a jury to resolve all doubts adversely to his
defense. But the rule cannot be applied unless it appears
that the proof, whether it is a living witness or paper, is with-
in his power. It is easy to see that the evidence offered here
might be used for an ulterior purpose, although not pressed
by the prosecution, yet entertained and made effective by
the jury, and there certainly could be no presumption that
the prosecution had the power to produce any particular wit-
ness, certainly not one of those named, nor did the law re-
quire it of them. It is, therefore, impossible to find any
reason for, or lawful purpose to be gained by the proof offer-
ed, and its admission was a very dangerous innovation upon
the general rule, which excludes it as irrelevant to the issue.
Nor was it a mere question as to the order of proof. It was
introduced as affirmative evidence, and while it could do the
prosecution no legal good, must subject the defendant to the
prejudices and unfavorable inferences suggested by the
absence of a co-defendant whose presence, if innocent, could
not but assist the defendant, but whose absence and refusal
to obey a subpœna might easily be regarded as a confession

of guilt, and could not fail to strengthen in an appreciable degree the case of the prosecution. The only case cited in support of the ruling is *Pease* v. *Smith*, (61 N. Y. 477). That was a civil action. The absent witness was confined in a state prison, not by his own consent, and whatever may be said of the decision there made, it has no application here nor should it be extended to other circumstances than those there disclosed.

It is also said by the District Attorney that the defendant upon cross-examination of one of the prosecutor's witness, had shown the absence of one of these persons and that he was in Canada. The same fact as to all of them seems to have been assumed as if already before the jury. Why then was the evidence insisted upon? In answer to a question from the learned trial judge whether the defendant would not " have a right to argue to the jury in summing up, that, in view of all the testimony, the people should have called Moloney," the defendant's counsel said, " No, sir, How could we argue that, when we know already from the opening of the district attorney that Moloney is not accessible to a subpœna," and disclaimed any intention of so doing, or that it " could be done in common fairness," with such earnestness that it is very difficult to see why the introduction of the evidence was pressed if no other purpose existed than to escape the imputation of keeping back testimony. Proof even of the absence of these persons was inadmissible. But that was not all. The proof was not only of their absence, but unavailing search by a detective, the service of a subpœna upon some of them and the failure to obey its mandate. Under the circumstances of the case the ruling of the court in this instance may not have been of much importance and upon it alone we should not grant a new trial. But the legal principle which requires relevant and material evidence, and admits no other, is important, and however serious the charge against an accused person may be, and however great the evil it uncovers, he cannot properly be made the subject of a judicial sentence unless the crime is substantiated according to the

established rules of evidence. The other exceptions referred to point to violations of those rules to the manifest prejudice of the defendant, and to the benefit of those exceptions he is entitled. They require a new trial, and that it may be had the judgment of the court below and the conviction should be reversed and a new trial granted.

All concur.

PECKHAM, J.—It seems to me that the admission of the evidence given by the witness Pottle was error.

There is not room for much discussion in regard to the the general principle upon which evidence that proves or tends to prove the prisoner guilty of other felonies or misdemeanors is admitted. It is conceded on all sides that the admission of such testimony forms an exception, and a very material and important exception, to the general rule of evidence. The general rule is that when a man is put upon trial for one offense he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that under ordinary circumstances proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded. But for the purpose of showing guilt of the offense for which the prisoner is on trial as also for the purpose, where that is important, of showing motive or intent with which an action claimed to be a crime was committed, evidence which is material upon such issues is admitted, although it may also tend to show, or even directly prove, the guilt of the accused of some other felony or misdemeanor.

Whether the evidence in any particular case comes within the well known exceptions to the general rule is often the difficult question to solve, and not as to what the rule itself really is. Thus there is a class of cases in which evidence is admitted where it is material to show guilty knowledge of the character of the act committed by the prisoner. A good illustration of this class of cases is in the trial of an indictment for passing counterfeit money. Evidence of the passage of like money within a reasonable time before or after the commission of the offense for which the prisoner is on trial is

admitted for the purpose of showing that when he passed the money in question it was not through ignorance of its character. A man might think the money he passed was good and he might be mistaken once or even twice, but the presumption of mistake lessens of every repetition of the act of passing money really counterfeit. Hence evidence of such repetition bears directly and materially upon the issue before the jury. To this same class would belong the case of an indictment for shooting an individual. For the purpose of proving that the shooting was not accidental where such a fact is claimed, evidence may be given of efforts or even threats made by the defendant to shoot the same individual on prior occasions. Thus the probability of the shooting being accidental is lessened by showing prior efforts or threats to accomplish the same act for which the prisoner is on trial. Cases of embezzlement and of obtaining money or other property by false pretenses come under the same general rule. A man indicted for the embezzlement of funds by false entries might claim, with some degree of plausibility perhaps, that the entry was a mistake, but the probability of such mistake would be greatly lessened by proof that other false entries of the same kind had been made at about the same time by the same persons.

Then there is another class of cases in which the facts show the commission of two crimes and that the individual who committed the other crime also committed the one for which the prisoner is on trial. Evidence is then permitted to show that the person was the person who committed the other crime, because in so doing under the circumstances and from the connection of the prisoner with the other crime, the evidence of his guilt of such other crime is direct evidence of his guilt of the crime for which he is on trial.

Another case in which evidence of this nature is admissible is where it is proper for the purpose of showing a motive for the commission of the main crime.

It is claimed in this case that the evidence was admissible on the ground that it showed or tended to show the intent

on the part of the prisoner in paying the money to Fullgraff after proof had been received that money was given him, and also upon the ground that it tended to show the motive of the prisoner for the commission of the crime. If this evidence did materially and directly tend to show either such intent or motive, and if it were not too remote in point of time, and if it logically connected the fact to be proved with the main transaction, then it may well be that it was admissible, even though it tended to prove the prisoner guilty of another and separate offense.

The admission of the evidence of Pottle seems to me, however, to carry the principle further and to a much more dangerous extent than any other case that has come under my observation.

Upon the question of the intent with which the money was paid to Fullgraff, the evidence I think falls far short of such logical and close connection therewith as is necessary to render it admissible. The fact being established that such payment was made and that the prisoner was connected with its payment, the intent could not be a matter of any real doubt. That it was paid to obtain the vote of Fullgraff as an alderman for granting the franchise to the Broadway surface railroad, could not be made a subject of honest discussion. All the evidence was to that effect and there was absolutely no evidence to the contrary, and to offer evidence of the commission of another crime for the avowed purpose of thereby showing the intent with which this money was paid to Fullgraff would have made to my mind a clear case of offering it on a colorable issue and using it for another and wholly inadmissible purpose. However that may be the evidence was not admissible even on the question of intent.

As is very well said by Mr. Justice Agnew in *State* v. *Lapage* (57 N. H., 245 at 295), "it should also be remarked that this being a matter of judgment it is quite likely that courts would not all agree, and that some courts might see a logical connection where others could not. But however extreme the case may be, I think it will be found that the

courts have always professed to put the admissibility of the testimony on the ground that there was some logical connection between the crime proposed to be proved other than the tendency to commit one crime as manifested by the tendency to commit the other."

Judge EARL, in the case of *People* v. *Shulman* reported in a note to *Mayor* v. *People* (80 N. Y., 364 at 375), states as follows : " But there is one general rule which must apply to all such cases. There must be in the transaction thus sought to be proved, some relation to or connection with the main transaction. That is, they must show a common motive or intent running through all the transactions or they must be such as in their nature to show guilty knowledge at the time of the main transaction." And in the case of *Mayor* v. *People*, *supra*, which was the case of an indictment for obtaining goods by false pretenses, RAPALLO, J., in speaking of the admissibility of testimony of this nature upon the question of intent, said, " that when the representations, their falsity and the knowledge of the accused that they were false is established by competent testimony, the allegation that they were made with intent to defraud may be supported by proof of dealings by the accused with parties other than the complainant which tend to show a fraudulent scheme to obtain property by devices similar to those practiced upon him, provided the dealings are sufficiently connected in point of time and character to authorize an inference that the purchase from the complainant was made in pursuance of the same general transaction."

Under such conditions and guided by such rules it does not seem to me that this evidence by Pottle was so connected legitimately with the main transaction, that of the alleged bribery of Fullgraff, as in any way to characterize the intent with which the money was alleged to have been paid Fullgraff, in any other sense than the evidence tends to show capacity upon the part of the prisoner to commit the crime because he had months before attempted to commit one of a similar nature with another person for the purpose of accomplishing another act.

It is a very general and extremely broad, and I think a dangerous, ground upon which to claim the admissibility of evidence of this character, to say that it tends to show that the prisoner was so desirous of obtaining a railroad on Broadway that he was willing to commit a crime for the purpose of securing his object. It seems to me this is nothing more than an attempt to show that the prisoner was capable of committing the crime alleged in the indictment because he had been willing to commit a similar crime long before, at another place and for the purpose of accomplishing the commission of another act by a different person. To adopt so broad a ground for the purpose of letting in evidence of the commission of another crime is, I think, of a very dangerous tendency. It tends necessarily and directly to load the prisoner down with separate and distinct charges of past crime which it cannot be supposed he is or will be in proper condition to meet or explain, and which necessarily tends to very gravely prejudice him in the minds of the jury upon the question of his guilt or innocence. I do not think that evidence of the kind in question, and in such a case as is here presented, legitimately tends to enlighten a jury upon the subject of the intent with which money was paid many months thereafter to another person, at a different place and to accomplish the commission of another act. It throws light upon that intent only as it tends to show a moral capacity to commit a crime. It gives under the circumstances entirely too wide an opportunity for the conviction of an accused person by prejudice, instead of by evidence showing the actual commission of the crime for which the defendant is on trial.

Upon the question of motive, using that word in the sense of a reason why the prisoner should commit the crime, I do not see that it has the least materiality or bearing. It shows and tends to show no such reason. It only tends to show that the prisoner took an interest in the inclusion of Broadway in the bill permitting railroad tracks to be laid in the streets of cities. It might be argued therefore that he took an interest in or had a desire for a railroad in that street.

As a reason or motive for such desire the evidence in no aspect tends to enlighten us. By the passage of the act of 1883, the prisoner would have had no greater right than any one else to obtain the road. Others could compete for it as well as a corporation in which he was interested. No reason for any interest in this question is shown by this evidence. It is the simple, bald and naked proposition which the evidence is claimed to prove, viz., the interest of the prisoner, and this interest is to be established by proof of the commission of a crime under the circumstances detailed, and months before the commission of the one charged in the indictment. This cannot be said to prove or tend to prove a motive for the commission of the crime in question within the meaning of the law, and upon the question of mere interest or desire, the evidence is too remote and too dangerous to be permitted.

One of the cases cited upon this branch of the argument was that 'of *Pierson* v. *People*, (79 N. Y., 424). There the prisoner was charged with murdering one Withey, who was a married man. The prisoner was also a married man. Evidence had been given of intimate relations, though not necessarily criminal, between the prisoner and Withey's wife before the death of the deceased. After the murder the prisoner took the widow and her sister to the house of a friend in the evening and came away with the widow late that night alone. A few days after the murder the prisoner disappeared from the neighborhood. It was then proved by a witness from Michigan, who was a clergyman, that the prisoner and the widow of Withey appeared before him and were married, and that the prisoner declared on oath before him that he knew of no legal obstacle to his marriage with the woman and thereupon he married them. The evidence was objected to on the ground that it had no direct or material bearing upon the main question in the case, and that it simply tended to prejudice the prisoner by proving him guilty of another and separate felony. The evidence as to the murder was circumstantial, and this court held that the evidence in controversy was proper for the purpose of proving a motive for

the murder. In that case the evidence showed a direct and logical connection between the murder of the deceased and its perpetration by the prisoner. It showed that the prisoner had a passion for the possession of the wife of the deceased, and that for the purpose of obtaining possession of her person he did commit the crimes of perjury and bigamy, and to accomplish this possession of the woman the taking off of the woman's husband was an obvious necessity. The motive of the prisoner was the desire for the woman, and the strength of that desire, in other words the strength of the motive which impelled the murder, was shown in this way.

The case of *People* v. *Wood* (8 Parker's Cr. Rep. 681) was also cited. That was a Special Term case which arose upon an application to the learned justice who delivered the opinion for a stay of proceedings upon the conviction of the defendant for murder. Evidence had been given of separate and distinct felonies committed by the prisoner for the purpose of showing motive on his part in the killing of the deceased. The learned court held that the evidence was admissible because it tended to show with other evidence, that the felonies were other parts of a single transaction, influenced by a single motive and design to accomplish a single object; that they were all connected by unity of plot and design, and if proved would tend to show the motive which actuated the prisoner in taking the life of the person stated in the indictment. In that case the evidence tended to show that each felonious act was a necessary one for the purpose of carrying out the main object which then existed in the mind of the prisoner, and that all of them formed but one transaction and were connected together as parts of one whole.

Now the evidence in the case at bar was of no such character. At the time of its alleged occurrence no law had been passed. It did not appear and could not appear that at that time any law ever would be passed. It was an act remote in point of time, different in purpose and of an entirely separate and distinct matter, forming no part of one main transaction.

and to my mind coming nowhere near the standard for the admissibility of such evidence pronounced by all the cases which I have been able to find.

The case of *People* v. *Stout* (4 Parker's Cr. Rep. 432) contains the same general principles. There evidence was admitted to the effect that the prisoner was seen in bed with the wife of the man he was charged with murdering, although such wife was also the prisoner's sister, and it was admitted as furnishing a motive for the prisoner to get the husband out of the way.

I have looked at the other cases referred to by the learned counsel for the prosecution and find that they come under the designation of one or the other of the classes already referred to.

*Commonwealth* v. *Tuckerman* (10 Gray, 173, 199) was a case of embezzlement and evidence of other embezzlements from the same party during a series of years and contained in a statement made by the prisoner was admitted.

*Commonwealth* v. *McCarthy* (119 Mass., 354) was an indictment for arson. To prove the intent of the prisoner evidence was received that on two prior occasions the prisoner had set fire to a shed ten feet distant from the building destroyed and connected therewith by a flight of stairs. This had a direct tendency to prove that the firing was not accidental but intentional and felonious.

*Commonwealth* v. *Bradford* (126 Mass., 42) was an indictment for adultery. Evidence of improper familiarity between the defendant and the same woman, shortly before the act in question was admitted. The evidence was admitted on the ground that intimacy and these acts of familiarity with the same woman had a tendency to establish the fact of the adultery charged in the indictment. Evidence tending to show previous acts of indecent familiarity would have a tendency to prove, in the case of the same woman, of course, a breaking down of all the safe-guards of self-respect and modesty and hence a gradual preparation of the woman to lend herself to the commission of the crime.

The case of *People* v. *O'Sullivan* (104 N. Y., 481) forms no precedent for the admission of the evidence in this case. We simply held that upon the trial of the defendant for the crime of rape it was competent to prove that he had attempted to commit the same crime upon the same woman a short time prior thereto. It was put upon the ground that upon the trial of a person for a particular crime it is always competent to show upon the question of his guilt that he had made an attempt at some prior time, not too remote, to commit the same offense. It was said further that it would be incompetent to prove that the defendant had committed or attempted to commit a rape upon any other woman. And it was stated that upon the trial of a prisoner for murder it is competent to show that he had made previous attempts or threats to kill his victim, and hence upon the same principle it was held that when charged with rape it was competent to show that the defendant had previously declared his intention to commit the offense or made an unsuccessful attempt to do so.

In the case of the *Commonwealth* v. *Abbott* (130 Mass., 472) upon an indictment for murder, proof was offered on the part of the prisoner of former ill feeling of the husband of the deceased toward the deceased. It was rejected as too remote and disconnected with the crime charged. Particularly as there was evidence of the parties living together on good terms long subsequent to the time of this alleged ill feeling. This is certainly no precedent for the admission of the evidence in question in the case at bar.

In *Commonwealth* v. *Jackson* (132 Mass., 16) the prisoner was indicted for selling property by false representations under the Massachusetts statute. Evidence of sales of other property of a like nature, to other persons, under representations proved false, was admitted for the purpose of showing the intent with which the representations in question were made. The Supreme Court of Massachusetts held that the evidence was inadmissible, and that for the error of its admission a new trial should be granted. The case is cited only for the purpose of quoting the opinion of the court upon the danger of this

kind of evidence. DEVENS, J., writing the opinion, said that "the other statements made the defendant at other times as to other animals which he sold, might have been false, while those made in the case for which he was tried were not. The transactions formed no part of a single scheme or plan, any more than the various robberies of a thief. They were entered on as from time to time he might succeed in entrapping credulous or unwary persons. Even if they were transactions of the same general character, they differed in all their details, and the defendant was compelled to defend himself against three distinct charges in addition to the one for which alone he was indicted. Evidence of the commission of other crimes by a defendant may deeply prejudice him with the jury, while it does not legally bear upon his case. It certainly would not be competent in order to show the intent with which one entered a house or took an article of personal property to prove that he had committed a burglary or larceny at another time." He further said in the same case: "The objections to the admission of evidence as to other transactions, whether amounting to indictable crimes or not, are very apparent. Such evidence compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the one immediately before it, and by showing the defendant to have been a knave on other occasions creates a prejudice which may cause injustice to be done him." I think the remarks are very pertinent in this case. The reasoning herein leads to the exclusion of evidence as to past offenses such as Pottle's evidence tends to prove, whether it is directed towards proving the bribery of clerks to committees or members of the Legislature of 1883 or 1884.

Upon the same basis it is difficult to see the materiality or admissibility of the evidence that the prisoner, after the passage of the act of 1884, paid to Phelps the $50,000, as testified to by Phelps. The evidence it can be seen had a tendency to greatly prejudice the prisoner upon the issue of his

guilt of bribing Fullgraff, while wholly inadmissible for any such purpose, and it would seem to be quite questionable to admit it for the purpose of proving an interest in a Broadway railroad about which there could be and was no dispute or contradiction. We call attention to the question without absolutely deciding it.

We are quite clear that errors have been committed by the admission of evidence in this case at war with the well settled law on the subject. That law must protect all who come within its sphere, whether the person who invokes its protection seems to be sorely pressed by the weight of the inculpatory evidence in the case or not. It cannot alter, for the purpose of securing the conviction of one who may be called or regarded as a great criminal and yet be invoked for the purpose of sheltering an innocent man. In the eye of the law all are innocent until convicted in accordance with the forms of law and by a close adherence to its rules.

For the reasons above given, as well as upon all the grounds so well stated in the learned opinion of my brother DAN-FORTH, I am in favor of reversing this conviction and granting a new trial.

NOTE. See note to report of this case at General Term *ante,* p. 389.