Proper vs. The State.

---

PROPER, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 27 — June 21, 1893.*

*Criminal law: Rape: Evidence.*

1. On a prosecution for the rape of a girl ten years old, she was asked, "Was there anything left when he got away from you? Was it wet between your legs?" These questions being objected to as leading, counsel added, before answer, "What about that, if you remember?" *Held,* that this modification obviated the objection. *Hardtke v. State,* 67 Wis. 552, distinguished.

2. The questions, "Did he do anything with you that you thought he ought not to?" and "What else did he do — about taking it in your hand,— anything about that?" were not objectionable as being leading.

3. A physician, after stating a variety of causes which might have produced the condition of the girl's person found by him on examination, was properly allowed to state that if a male had done with her what she stated he would be very apt to lay it to that, in the absence of other causes, and that he did not find any other cause.

4. Evidence that the prosecutrix had told others what had occurred was admissible in corroboration of her evidence.

5. An officer was properly allowed to testify as to what took place when he went to the defendant's house to get the girl at the time he was investigating the case, to the effect that defendant's wife (defendant himself being absent) endeavored to prevent the girl from going with him.

6. Evidence that the defendant got into the bed in which the prosecutrix and an older girl were sleeping and had intercourse with the latter, was admissible as showing an indecent assault upon both and as corroborative of the testimony of the prosecutrix in respect to previous and subsequent assaults upon her.

7. Defendant not having objected to the question asked of said older girl, as to whether on that occasion he had intercourse with her, but having taken the chance that she would contradict the evidence of the prosecutrix in that respect, was not entitled to have her affirmative answer stricken out. It was a matter of discretion whether to strike out evidence thus received without objection.

8. A remark of counsel for the prosecution, during his argument to the jury, that "the defendant was taking improper liberties and advantages with every person who came under his roof," was not improper, in view of the evidence.

9. Under an information charging rape and also that on a certain date and at divers other times between that and a later date defendant assaulted the prosecutrix with intent to unlawfully and carnally know her, it was proper not to confine the prosecution to proof of one act of attempted sexual intercourse between the dates mentioned. Proof of other attempts was competent in corroboration of the prosecutrix as to the substantive charge.

10. Any attempt to have carnal knowledge of a female under the age of consent is, by force of the statute (sec. 4382, S. & B. Ann. Stats.), necessarily against her consent and forcible; and said sec. 4382 is not void for uncertainty.

11. Testimony of an officer of a humane society as to the circumstances under which the prosecutrix was placed with the defendant with a view to adoption, was admissible; and it was within the discretion of the court to allow such officer to sit by her when she gave her testimony.

ERROR to the Circuit Court for *Waukesha* County.

The plaintiff in error was tried in the circuit court for Waukesha county upon an information in two counts; the first charging him with rape committed on the person of Clara O'Brien, a female child, under the age of twelve years, under S. & B. Ann. Stats. sec. 4382; and the second, with having, on the 16th of January, 1892, and on divers other days and times between that day and the 21st of March in the same year, feloniously assaulted Clara O'Brien, she then and there being a female child under the age of twelve years, to wit, of the age of ten years, with intent her, the said Clara O'Brien, then and there to unlawfully and carnally know and abuse, etc.

It appeared at the trial that Clara O'Brien was at one time under the charge of the Wisconsin Humane Society, and evidence by Mr. Whitehead, the superintendent, was given to the effect that her father was dead, and that her mother, with five children, came to Milwaukee to be near where her father was, who was drawing a pension and could help her. The defendant came to Mr. Whitehead seeking a little girl, and after inquiry the girl Clara O'Brien was placed in his custody, with a view of being adopted after trial of three months. Objection was made to permitting Mr. Whitehead to sit by the girl at the trial. The court ruled that he might do so to remove her embarrassment, but he was not to prompt her or tell her what to answer at all. She testified in substance that her mother was living; that she was taken away from the defendant's March 20th, but was there at Christmas; that when she went there the defendant's family consisted of himself, his

wife, and a little boy, two years old; that a girl named
Emma worked there while she was there, and stayed some
time; that after she went away another by the name of
Coates came.   She was asked: "While you lived there, did
he do anything with you that you thought he ought not
to?"   This was objected to as leading.   The court allowed
it to be answered.   The witness answered: "He done it in
bed.   He didn't do anything in the daytime.   After I got
in bed at night, he got in bed with me.   He slept with me
more than once; about every other night.   He laid in bed
with me, and on top of me.   Made me put his . . . in
my mouth.   Made me put it in my hand, and pull it back
and forth.   When he laid on top of me, he tried to put
his . . . in mine."   "*Question*. Did it hurt any?   *An-
swer*. Yes, sir; I said 'Oh.'   (Objected to as leading.   Over-
ruled.)   I said 'Oh.'   At any of those times he laid on top
of me, he put his . . . against me only once.   He did
not at any other time when he came to bed with me.
"*Q*. Was there anything left when he got away from you?
Was it wet between your legs?   (Objected to as leading.)
*The Court:* It is a little leading.   (Exception by defendant.)
*Q*. What about that, if you remember?   (Objected to as
leading.   No ruling.)   *A*. There was something wet in bed
on the sheet when he laid in bed with me, and on my night
dress, and on his shirt, too.   I noticed the wet about it.
When he didn't get on top of me, he laid down.   (Objected
to as incompetent.)   When he laid down with me, he put
his leg over mine, and put his . . . to mine, too, and
put his . . . into mine again, too.   He did that more
than once in that way.   I think, as near as I can remember,
about two or three times in the night.   Mrs. Proper was
sick at that time.   When he tried to put it in my mouth,
I turned my back to the wall, and he pulled me over, and
opened my mouth with his fingers, and tried to get it in."
(Motion to strike out as incompetent, etc.)   "He kept

doing that until he got his . . . in. Then he pushed it away in." "*Q.* What else did he make you do? *The Court:* Do you refer to the hand? *Q.* About taking it in your hand,— anything about that? *A.* He made me take it in my hand, and pull it back and forth. If he told me to keep hold of it, and I wouldn't, he held his hand on it, and he pulled it back and forth with his hand. He made me do this about twice while I was there. When I told him to quit, he would say, ' Hush, don't let mamma hear,' — Mrs. Proper. He never said anything to me about not telling any one else. I first told Mrs. Meinecke. I told one of the girls that worked there, Ida Coates, about it. The last time he did anything of this kind was March 20, 1892, on Sunday. I was taken away on the next day."

Being cross-examined, she testified that she told lies and stories while she was there; that they punished her, and she was disobedient; that while the girl Emma was there she slept with her some of the time. "She was good in bed. *Mr. Proper* done the same thing to her, only putting it in her mouth, and holding her hand on it. I would not call her a good girl. There were two rooms upstairs and three down. Me and the Coates girl slept upstairs. She went away a long time before I went. When he did these things to me, I was sleeping in the bedroom downstairs next to the kitchen. There was a door between the kitchen and that, and a door to go into the hall, and then a door to go into the front room. They were all in a line. Mrs. Proper slept in the front room. She could not see the bed from the front room. They kept lights where me and Charlie slept. He was only two years old. He did this first about two or three weeks after I was there. First told of it to anybody in March. Mrs. Proper slept sometimes in the middle room. He would come out of the front room after she was asleep, and come and lay with Emma when she was there. These things happened

as soon as I went to bed, at nine o'clock, and he came right
after.  Mrs. Proper would be in bed at that time, asleep.
No one but *Proper* ever did these things to me.  I never
thought of that until I came there.  The second time he
attempted to do it I told him to quit.  Myself, *Mr. Proper*,
and Emma slept in the same bed for a time.  I don't re-
member what day or month she left there.  He did this to
me before Emma was there, but not while she was there.
They told me to turn over to the wall and go to sleep, and
I wouldn't.  They kept me awake whispering to each other.
I went away from there with Mr. Dwinnell.  The Coates
girl went away, and, the next day after, Mrs. Meininger
asked me about this.  I told part of it to her.  Don't know
how long that was before I went away to Dwinnell's.
*Proper* did not ask me to go to bed with him.  I asked
him to lay with me.  I was lonesome.  I was sleeping
downstairs then.  This was after the Coates girl had gone
away."

It was proved that Clara O'Brien was born June 24,
1882.  Dr. Philler testified as to an examination of the girl
made March 22d, at the time she was at Dwinnell's; that he
found hyperemia, redness in the surroundings of the geni-
tals and the internal or inner aspect of the thighs; that
this was not a normal condition.  He was asked if he knew
that a male had done with her what she states, would he
have attributed the condition he found to that cause.  Ob-
jected to, as leading.  "I should be very apt to have laid
it to that, in the absence of other causes.  I did not find
any other cause, she being neatly dressed, and clean in
her person otherwise.  Other irritating causes might have
produced it.  Acidity of urine, the pressing of new gar-
ments, general uncleanliness, are all conditions which may
have produced the same irritation, and long walks may
have produced it."  He further said that what she stated
had been done to her would be sufficient cause for the ap-

pearance three days after it is said to have taken place. "The hymen was not ruptured. Discovered no lacerations. If there had been sexual intercourse on the 20th of March, I could have determined it in a child of that age. There is what is called a vulvary penetration. In that case there would be no rupture of the hymen. I believe the child would have surely shown signs of pain, and would have cried out in case there was a penetration."

Mr. Dwinnell, the undersheriff of the county, testified to taking Clara to his home the 21st of March, from *Proper's.* "I went up there to investigate this. Meiningers reported to us the information. I told the girl I would like to take her down town with me. Mrs. Proper hollered at her not to go; she shouldn't leave the house. I tried to coax her to go with me. She called her in, and told her she could not go. I then told Mrs. Proper I must take her. I told her that I was an officer, and finally had to threaten her that she would get herself into trouble, before I could get the girl to go. She had the little girl crying and scared her." This was objected to as a conversation with the defendant's wife, but the court overruled it. He testified that she told him this story, and that he took her to the district attorney's office. The court ruled that this fact might be shown, but that the conversation was not competent.

The girl Emma testified on behalf of the state, stating that she and Clara slept in the bedroom downstairs; that the defendant came to their bed Thursday night, and got in bed. "This little girl was in bed with me this night. About nine or half past, when I had been a long while asleep, the defendant came, and jumped in bed, and jumped on top of me. *Question.* Did he do anything else to you? *Answer.* Yes. *Q.* He had intercourse with you? *A.* Yes, sir. I don't know whether anything was said by myself or *Mr. Proper* to the girl that night about telling her to turn over. I was asleep when he came the first time, but after

he got in bed and got on top of me I woke up. He took advantage of me. After that I got up and sat on the edge of the bed, and didn't go to bed any more that night. I went away the next night. I made a complaint before Mr. Evans for this. Don't know that it was the 21st of January or not." The complaint was produced, which showed that was the alleged date. The girl Emma never saw him do anything improper to the little girl. "After I retired at night with the little girl, the defendant would come into the room, and kiss the little girl, and want to kiss me, after we got in bed. Did it two or three times. Clara told me something about the way he used her when we were sleeping upstairs. I repeated it to my married sister. *Q.* What was that the little girl told you about the abuse of her person by the defendant? (Objected to.) *A.* I cannot understand about that. *Q.* Was it about improper things he had done to her? *A.* Yes, sir. (Objected to.) *The Court:* This is received more for the purpose of showing that the complaint was well founded, because when a woman's virtue is assaulted the natural impulse is to tell somebody,— her parents, or sister, or some one. Frequently, if she keeps still about it, there is a suspicion upon it; and it is admitted only for that purpose. (Exception taken.)" On cross-examination she said: "He came upstairs to my room more than once. Don't know how many times. Quite often, because the light was up there. I always turned that down, and he would come up and get it. He would not always come to the bed. He came to the bed five or six times. Always kissed the little girl, and attempted to kiss me. (Objected to.)"

Mrs. Meininger testified to hearing the girl make "outcries, as if she was being punished. Sometimes I heard them quite often. They attracted my attention. *Q.* Did you have your attention called to a condition of things that was not proper between the girl and *Mr. Proper?*

Proper vs. The State.

(Objected to.) *A.* I had my attention called to the story by report. I was told by my husband to take the little girl aside and ask her questions, and did so. I had a talk with her about her relations with *Mr. Proper.* I asked her if he assaulted her, and she told me." This was objected to. "*The Court:* I doubt very much whether you can show any of it. I doubt whether it is competent anyway. I think not." "We live on the south side of the house, and Propers on the north, in a double house. I did not go there for friendly purposes."

The defendant was sworn in his own behalf, and described the situation of the rooms in the house. He said that Clara came there in August, 1891, and at first slept upstairs until October. He denied the charges in detail made against him. He said: "On the night of the 19th of March, she asked me to come and sleep with her. She was lonesome, and had had a bad dream the night before, and I went and laid down. I heard her testimony in regard to my making her take my privates in her hand, and pull them backward and forward. No such thing was done by compulsion on my part. When I woke up she had my privates in her hand. I scolded her for it. That was the only time anything like that was done that I know of, and that was without my consent." He denied having connection with Emma, as testified. He testified that he went up to the bed, and Miss Coates was there, and attempted to kiss her; that he always kissed the little girl before she went to sleep. "I did offer to kiss Miss Coates, and she did not refuse it. The little girl told lies at times. She was not obedient. When I went to lay down with the little girl, I was partly undressed. Had my shirt and drawers on. Had taken off my other clothing. My drawers were buttoned at the top. I had probably been in bed an hour when I woke up, and she had my privates in her hands."

Evidence was produced to show the previous good char-

acter of the accused, but the witnesses had not been acquainted with him more than six months or a year. A witness was called to prove whether the feeling of Mrs. Meininger towards the Propers was kindly, which was objected to, as the witness Meininger had stated that she did not feel friendly and did not go there. The court excluded this testimony. Mary Hill, a girl about nine years old, was called to prove that the girl Clara told her that the Propers used to punish her when she told lies, and that she said she would be as mean as she could, because she wanted to go back to Milwaukee again.

At this point the court ruled that there was not sufficient evidence to sustain a conviction under the first count, and that the prosecution should be confined to the second count. The defendant's counsel asked the court to exclude from the consideration of the jury all acts or testimony of acts prior to January 16th, the first time alleged in the indictment; to withdraw from the jury all statements made by Clara O'Brien of the injury to Miss Coates, George Dwinnell, Mr. Whitehead, and others of whom she testified; and to exclude all the testimony of George Dwinnell, Mr. Whitehead, Miss Coates, and others as to complaints made to them of injuries by Clara, and to exclude from the consideration of the jury all the testimony of the girl Emma in regard to connection with her. "*The Court:* There are so many propositions. Some of them you are correct about; others you are not, or in a modified form. The testimony of the statements to Col. Whitehead and others was for the purpose of showing that she made complaint. I did not allow them to go into details. I shall tell the jury, unless I forget it, not to take into consideration what was said there, only the fact that she did make complaint of his treatment. Evidence that she made complaint of any improper conduct at any time is competent as throwing light upon the charge against the defendant, not as proving any-

Proper vs. The State.

thing that he can be convicted of; but as showing his mode of conduct and action here as bearing upon the main question."

The defendant's counsel moved to strike out the statement of Mr. Armin, in argument, "that the defendant was taking improper liberties and advantages with every person who came under his roof." *The Court:* "I think it is a proper line of argument." No exception was taken to this.

After the defendant was convicted, a motion was made in arrest of judgment and for a new trial, mainly upon the exceptions taken, but alleging that sec. 4382, S. & B. Ann. Stats., was void for uncertainty, and that there was no allegation or proof that the offense was committed with force and against the consent of Clara O'Brien, and that the court erred in not confining the state to proof of one act of attempted sexual intercourse, and in permitting proof of attempted acts from January 16th to March 21, 1892, and in admitting proof of attempted acts prior to the first time alleged in the information, and that the verdict was contrary to law and evidence; that the court erred in permitting Mr. Armin to go outside of the record in arguing on behalf of the state. The motion was denied, and the defendant was sentenced. The plaintiff in error assigned fourteen errors, the substance of which and other facts material will appear in the following opinion.

The cause was submitted for the plaintiff in error on the brief of *D. J. Hemlock,* and for the defendant in error on that of the *Attorney General* and *J. M. Clancey,* Assistant Attorney General.

To the point that the trial court erred in admitting and not excluding from the consideration of the jury the testimony of the witness Emma to the effect that the accused had committed rape on her, counsel for the plaintiff in error cited *Farris v. People,* 129 Ill. 521, 16 Am. St. Rep. 283; *People v. Sharp,* 107 N. Y. 427, 1 Am. St. Rep. 851; *People v. O'Sullivan,* 104 N. Y. 483, 484.

PINNEY, J.   1. During the trial many questions put to witnesses, particularly the prosecutrix, were objected to by the defendant's counsel on the ground that they were leading, and several assignments of error rest on this ground only.   Prominent among these were the questions mentioned in the statement to the effect: "Did he do anything with you that you thought he ought not to?   Did it hurt any?   Was there anything left when he got away from you?   Was it wet between your legs?   What about that, if you remember?   What else did he do — about taking it in your hand,— anything about that?"   Leading questions are those which suggest to the witness the answer expected or desired, and it is said that questions are objectionable on that ground which embody a material fact and admit of an answer by a simple negative or affirmative (1 Greenl. Ev. § 434); but not unless they suggest which answer is the desired one, or are more suggestive of one answer than another (*Spear v. Richardson*, 37 N. H. 26).   Whether leading questions shall be permitted rests very much in the sound discretion of the court, and rulings in respect to them are not the subject of exception unless there has been an improper exercise of that discretion (*Barton v. Kane*, 17 Wis. 37), or where the question was allowed plainly to the injury of the complaining party (*McPherson v. Rockwell*, 37 Wis. 159, 162).   Upon this point the case of *Hardtke v. State*, 67 Wis. 552, was relied on, especially in respect to the third and fourth questions above, which it was contended were like the question held by a majority of the court to be leading, namely, "Was there any blood on your underclothes after this?"   The court, in respect to one of these questions, said, "It is a little leading," when counsel added, before answer, "What about that, if you remember?" and the objection was renewed.   The question was answered, and no exception was noted, but the answer was objected to as incompetent, and the same objection was

made to the description of what the defendant did to her in various respects. The modification of the questions, as stated, relieved them from the imputation of being leading, and took them out of the ruling in *Hardtke v. State, supra.* The other questions asked this witness were free from objection as being leading, and her evidence as to what he did to her was properly admitted. It is to be remembered that the prosecutrix was a child of tender years, not having quite reached the age of ten years at the time of the trial.

2. We do not perceive any valid objection to any of the questions put to Dr. Philler. They were addressed to him as a medical expert, calling properly for matters of opinion, based on the examination he made of the girl, and were to some extent based, as they might properly be, upon hypothetical questions. After stating a variety of causes which might have produced the redness of the genitals, there was no objection to his stating that, if a male had done with her what she stated, he would be very apt to lay it to that, in the absence of other causes; that he did not find any other cause, she being neatly dressed and clean in her person otherwise.

3. The evidence of undersheriff Dwinnell in respect to what the girl told him as to the treatment she had received, and what she told others, Mrs. Meininger, the girl Emma, and Miss Coates, was clearly competent for the purpose for which it was admitted, as explained by the circuit judge at the trial and in his charge to the jury, not to prove the substantive charge, but to show that she complained or reported what she claimed had occurred, and as in some degree a corroboration of her evidence at the trial. Whart. Crim. Law, §§ 565, 566. It is generally considered that there can be no conviction in cases such as this simply upon the unsupported and uncorroborated evidence of the prosecutrix, and such testimony is held admissible in corroboration, and in many cases it is all such evidence that the nature of

the case admits of. The evidence of the undersheriff in respect to what took place when he went to the defendant's house to get the girl Clara, and when endeavoring to investigate the charge that had become current, was proper, though not particularly important, and that the defendant's wife was not a competent witness as to what took place on this occasion was not, we think, any reason for its exclusion. The defendant was not present, and there was no evidence to show that what his wife said or did was in any way inspired or directed by him.

4. Whether the court erred in not excluding from the consideration of the jury the evidence of the girl Emma, to the effect that the defendant came to the room in which she and the prosecutrix were sleeping, and got in bed with them and there had sexual intercourse with her, is a question not free from difficulty. It is a general rule of law, recognized by numerous cases, that upon the trial of the accused for one offense it is improper to prove that he has been guilty of other offenses, and that upon a trial for rape it would be incompetent to prove that the accused had committed or attempted to commit a rape upon another woman; but upon principle it seems that upon trial for rape, or for an assault with intent to commit it, it would be competent to show that the defendant had previously made an unsuccessful attempt to commit the same offense with which he was charged. The evidence tends to show that previous to his last assault upon the prosecutrix in March, he had made other like assaults during the winter months, and before Emma became his domestic servant, as well as after the occurrence in question; that he had behaved in a lewd and indecent manner to the girl Emma and the prosecutrix in the room where they slept, visiting it at late hours, evidently for improper purposes, and, it is claimed, with the intent which characterized his conduct towards the prosecutrix on subsequent occasions. He got into bed with them

on the particular occasion. This was an indecent assault of itself, and of a very gross character, upon both. This conduct on this occasion was corroborative of the evidence of the prosecutrix· in respect to other indecent or criminal assaults, such as are charged in the information, and would tend to sustain and render more credible her evidence of such other occurrences. The general subject is fully considered in the cases of *People v. O'Sullivan*, 104 N. Y. 483; *People v. Sharp*, 107 N. Y. 427; *Farris v. People*, 129 Ill. 521, 529. In *Comm. v. Ferrigan*, 44 Pa. St. 386, THOMPSON, J., says: "The rule on this subject may, in substance, be stated to be that when facts and circumstances amount to proof of another crime than that charged, and there is ground to believe that the crime charged grew out of it or was in any way caused by it, such facts and circumstances may be proved to show the *quo animo* of the accused." That the defendant went to the room in which Emma and the prosecutrix were sleeping and got in bed with them may fairly be considered to have been for the purpose of renewing his former attempts to gratify his brutal passions, and would have a material bearing in support of the testimony of the prosecutrix both as to previous and subsequent assaults upon her, and would be admissible for that purpose; and all that took place as a part of the transaction at that time would· be competent.

The reasonable and true rule seems to be laid down in *Comm. v. Merriam*, 14 Pick. 518, that "evidence should be excluded which tends only to the proof of collateral facts. It should be admitted if it has a natural tendency to establish the fact in controversy." It was argued in that case that the defendant was not to be put upon his trial for every act of his life, but it was answered by the court: "Be it so. If the evidence which was received has a natural tendency to corroborate other direct evidence in the case, it would seem to be clearly admissible." And in that

case, after making proof of one act of adultery by a witness whose evidence was attempted to be impeached, it was held that other instances of improper familiarity between the defendant and the same woman, not long before the act of adultery proved, might be given in evidence to corroborate him.    A greater latitude of proof as to other like occurrences is allowed in cases of sexual crimes.    Upon a prosecution for adultery, evidence of previous acts of improper familiarity, amounting to adultery, between the same persons, was held competent either in corroboration of witnesses for the prosecution, or to show the disposition of the parties to commit the crime.    *Comm. v. Thrasher,* 11 Gray, 450; *Thayer v. Thayer,* 101 Mass. 111; *Brooks v. Brooks,* 145 Mass. 574; *State v. Marvin,* 35 N. H. 22; *State v. Walters,* 45 Iowa, 389; *Comm. v. Choate,* 105 Mass. 458; *State v. Stice,* (Iowa) 55 N. W. Rep. 17.

We do not suppose that evidence that the defendant had committed adultery or been guilty of acts of improper familiarity with the girl Emma at another time or place, would be competent evidence on the trial of the present issue, but rest our ruling on the ground already stated, that the act of the defendant in going to the room where both Emma and the prosecutrix were sleeping, and getting in bed with them, was a grossly indecent assault on both; and the case in this respect is clearly distinguishable from the cases cited by counsel for the plaintiff in error.    So far as proof is concerned that criminal intercourse had taken place between her and the defendant, that fact was fully established by the defense on the cross-examination of the prosecutrix.    The defendant really made her his own witness on that point.    No objection was made to the question to the girl Emma whether, on the particular occasion in question, the defendant had intercourse with her, nor to the answer she gave in the affirmative, until the close of all the evidence, and then only by the omnibus motion,

which included a great many portions of the evidence which the defense desired the court to strike out. After the defense had allowed the witness ,Emma to answer this question without objection, and had taken the chances that she would contradict the evidence of the prosecutrix that the defendant had improper intercourse with her, they could not avoid the unfavorable result of the experiment by subsequently moving to strike out her testimony on this point. It was a matter of discretion with the trial court whether to strike out evidence thus received without objection. Besides, the proposition was not in proper form, as very many other points were coupled together with this in a single motion. *People v. Chacon*, 102 N. Y. 669; *Quin v. Lloyd*, 41 N. Y. 349; *Pontius v. People*, 82 N. Y. 339, 347. We are of the opinion that error cannot be assigned in respect to it, nor in relation to the motion, for the court does not clearly appear to have made any ruling on it, and no exception is alleged on that account.

5. The objection that the court improperly admitted testimony of Ida Coates, to the effect that the defendant had come to her bed and kissed her, and attempted to have sexual intercourse with her, is not sustained by the record. No such testimony appears in it. We do not think, in view of the evidence, that there was any impropriety in the remark of counsel for the state in summing up, nor that the state should have been confined to proof of one act of attempted sexual intercourse with the prosecutrix, between the periods mentioned in the information. Proof of other attempts was competent in corroboration of the prosecutrix as to the substantive charge.

6. The prosecutrix was under the age of consent, and was conclusively incapable of consenting to the offense charged. It was neither necessary to allege nor prove a want of consent. Any attempt to have carnal knowledge of a female under ten years of age is, by force of the stat-

ute, necessarily against her consent and forcible; and there is no ground for saying that the statute under which the defendant was prosecuted is void for uncertainty. *Fizell v. State*, 25 Wis. 364; *State v. Erickson*, 45 Wis. 86.

7. It was proper for Mr. Whitehead, the president of the Wisconsin Humane Society, to testify to the circumstances under which the prosecutrix came under his charge and was placed with the defendant with a view of being adopted. Whether Mr. Whitehead might sit by her when she gave her testimony was a matter resting in the discretion of the court.

Upon the whole record, we cannot say that the verdict is contrary to law and evidence. We find no error in the record of which the defendant can complain.

*By the Court.*— The judgment of the circuit court is affirmed.