### UNITED STATES v. ELTON et al.

(District Court, S. D. New York. April 29, 1915.)

1. CRIMINAL LAW ⬥⟿322—PRESUMPTIONS—INTERSTATE COMMERCE COMMISSION.

In a prosecution for attempting to create a monopoly of transportation facilities in violation of the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209), where defendant pleaded immunity under Act Feb. 11, 1893, c. 83, 27 Stat. 443 (Comp. St. 1913, § 8577), on account of having given testimony before the Interstate Commerce Commission during an investigation of the affairs of certain railroad corporations, it would be presumed that the Commission had power to carry on the hearing as one relating to the regulation of commerce between the states, and that it was therefore acting within its power in examining defendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 728; Dec. Dig. ⬥⟿322.]

2. CRIMINAL LAW ⬥⟿42—IMMUNITY TO WITNESS.

Under Act Feb. 11, 1893, conferring immunity as to matters testified to before the Interstate Commerce Commission, such immunity is only conferred where the witness would have been privileged under Const. U. S. Amend. 5, and where such evidence is given under compulsion; but where the evidence is given without assertion of the constitutional privilege, or is declined to be given on any ground other than because of its incriminating tendency, immunity is not conferred, the statute having been passed with regard to the prior construction of the fifth amendment, under which an assertion of privilege is necessary.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 45–48; Dec. Dig. ⬥⟿42.]

3. CRIMINAL LAW ⬥⟿42—IMMUNITY TO WITNESS.

Act Feb. 11, 1893, provides that no person shall be excused from testifying before the Interstate Commerce Commission on the ground that his testimony may incriminate him and that he shall not be prosecuted on account of such testimony. Defendant was subpoenaed, and testified under oath before the Interstate Commerce Commission as to an attempt to create a monopoly of transportation facilities in violation of the Sherman Act, after being led to believe that immunity would be given, and under threats that the Commission would proceed criminally against any person testifying under a subpoena who refused to give his evidence. The Commission had expressly refused immunity to others not sworn, and defendant had not conferred with counsel as to a possible waiver of immunity before testifying. He was subsequently indicted upon grounds as to which he had testified before the Commission. *Held*, that defendant was within the protection of the statute.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 45–48; Dec. Dig. ⬥⟿42.]

James S. Elton was indicted for conspiring with others to create a monopoly of transportation facilities. On demurrer to special plea in bar. Demurrer overruled.

⬥⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

H. Snowden Marshall, U. S. Atty., of New York City, R. L. Batts and Frank M. Swacker, Sp. Asst. Attys. Gen. (Robert P. Stephenson and James W. Osborne, Asst. U. S. Attys., both of New York City, of counsel).

Sullivan & Cromwell, of New York City (Royall Victor and Edward H. Green, both of New York City, of counsel), for defendant Elton.

HUNT, Circuit Judge. The plea alleges these facts:

The Interstate Commerce Commission, on May 6, 1912, on a complaint made, duly inquired into the prices and rate matters and other affairs of the New Haven Railroad Company and other New England corporations. The carriers were represented by counsel. Thereafter, about June 20, 1913, the Commission filed its report. New England Investigation, 27 Interst. Com. Com'n R. 560.

The findings of the Commission, filed June 20, 1913, among other things, were to the effect that the then present management of the New Haven Company started out with the purpose of controlling the transportation facilities of New England, and that, in addition to the matter of high rates, the Commission had considered the purchase by the New Haven of a preponderating influence of stock in the Boston & Maine Railroad. The Commission advised no advance in rates until the management of the New Haven and Boston & Maine was more prudent.

The Commission stated that originally they intended to subpœna Mr. Mellen, but that, the whole subject being under investigation by the Department of Justice, examination of Mr. Mellen, who was then president of the New Haven Company, would have given him immunity, wherefore the Commission decided not to call Mr. Mellen as a witness, but to give him an opportunity to make any explanation he desired not under oath. 27 Interst. Com. Com'n R. 587.

During the investigation and taking of testimony, the then chairman of the Interstate Commerce Commission, about April 21, 1913, stated that it had been his intention to ask the officials of the New Haven Company to appear and testify in relation to figures which the Commission had obtained. The statement of the chairman of the Commission was to the further effect that the witnesses were not produced and the Commission was asked to subpœna them, but thereafter it occurred to the chairman that, if the witnesses were brought before him under subpœna, it might interfere with some proceedings which the Department of Justice might have on hand; that it was intimated to the Commission that the Department of Justice then had the whole New England railroad situation under consideration, with a view of possibly asking indictment of the officials of the New Haven for having conspired to monopolize the transportation facilities of New England; that no such attempt to indict might be made, but that it was evident that examination concerning the matters under consideration would give the particular persons referred to immunity from prosecution; and that, inasmuch as the Commission did not wish to interfere with the Department of Justice administering the Sherman Act, the chairman believed the Commission could not properly subpœna or swear the witnesses, nor, indeed, allow them to testify under oath if they came voluntarily.

Further allegations of the plea are that about August 24, 1912, the Panama Canal Act (Act Aug. 24, 1912, c. 390, 37 Stat. 560), giving to the Commission jurisdiction for the determination of facts as to competition between carriers, was passed, and that about March 1, 1913, the amendatory act pertaining to the valuation of railroad property and securing information concerning railroad stocks, bonds, and other securities, was enacted. It is recited that the latter act gave authority to examine witnesses and to investigate and report on the history and organization of any railroad corporation, and conferred power to inquire into its financial arrangements, reorganization schemes, and matters of like character; that on February 9, 1914, the Commission, after reciting a resolution of the Senate of the United States authorizing reopening the examination of the affairs of the New Haven Company and the making of further investigation of its financial transactions, ordered such reopening and further examination as might be proper; that thereafter the Commission proceeded to investigate and to hear testimony pertaining to the New Haven road and other carriers, and during the course of such investigation heard witnesses and took testimony; that while the investigation was going on the first two witnesses called were H. P. Whipple and Samuel Hemingway. These two declined to testify or to answer most of the questions asked of them by counsel for the Commission. It appears then that the Commission notified the witnesses that their refusal to answer would be laid before the grand jury and indictments would be sought against them on account of such refusals, unless they promptly withdrew their refusals and agreed to testify. The plea of Elton sets forth that the refusal of the witness Hemingway to answer was laid before the grand jury of the District of Columbia at the instance of the Interstate Commerce Commission, and counsel for Hemingway was advised by counsel for the Interstate Commerce Commission of this fact, and thereupon Hemingway agreed to testify and the Commission proceeded; that about May 1, 1914, when Hemingway was testifying, the following occurred between Mr. Cummings, counsel for the witnesses, and Mr. Folk, counsel for the Interstate Commerce Commission:

"Mr. Cummings: I am perfectly willing, in view of transactions that have taken place, threats that have been made, and various collateral suggestions, to have the witness go on the stand and tell all that he knows, frankly, fully, and completely, concerning the relations of the Billard Company with the New Haven Company, or any of its subsidiaries—

"Mr. Folk: Let me state right here: Mr. Cummings has had something to say regarding threats. I think it would be well for the record, in view of his statement, to show that this witness, at a former hearing, refused to testify—declined to answer questions on the advice of counsel; that his refusal was taken up before the federal grand jury under the act known as the Compulsory Testimony Act, with the result that the witness was given the option of testifying or standing trial by reason of the proceedings mentioned."

Page 341 of Senate Document 543 of the 63d Congress, Second Session.

It is set forth that Mr. Folk, as counsel for the Commission, on the same day, but at a later time, stated publicly as follows:

"Mr. Folk: I merely wish to state this for the benefit of the record: Mr. Cummings says he advised the witness that the contemplated criminal pro-

ceedings could not be serious and could not be maintained. These proceedings were undertaken in good faith, and if the witness had not appeared to testify in good faith he would have been placed upon trial, and I disagree with Mr. Cummings as to the result of that trial. I believe, under the statute, he would have been convicted, and the Commission, in every instance hereafter, where the witness refuses to testify, without good reason, will proceed under the criminal section of the law mentioned."

Page 433 of Senate Document 543.

Elton sets forth that by letter dated May 26, 1914, defendant Ledyard was notified that the Commission withdrew the subpœna which had been issued for him and canceled the same and relieved him of all compulsion to appear before the Commission as a witness, but advised him that, if he desired to appear voluntarily, "waiving all immunity by the testimony," he might so advise the Commission, and the question of his being a witness would then be determined. It appears then that about June 4, 1914, the defendant Ledyard appeared, but was not allowed to be sworn as a witness, and was notified that whatever he might say would be used against him, but he expressed his readiness to testify and did testify. Defendant Cuyler made a statement, not under oath; counsel for the Interstate Commerce Commission expressly having it put on the record that Mr. Cuyler was called in behalf of the New Haven Company, and not on behalf of the Commission, and was not sworn.

Elton then says that he testified in obedience to a subpœna, after having been duly sworn as a witness, and without any exaction by the Commission, or any giving to him of any express waiver of immunity or express declaration of voluntariness of his testimony. He says that during the investigation the representatives of certain other defendants named in the indictment who were not subpœnaed and sworn were not permitted to testify, the Commission having publicly stated that they were not sworn, because the Commission did not desire to give to such other defendants immunity from criminal prosecution, or to interfere with the plans or desires of the Department of Justice to any further extent than the Commission should feel necessary in the performance of its duties.

It is then alleged that the Commission made its report about July 11, 1914, and that in this report the Commission used the following language:

"The purpose of the immunity statute, as the Commission understands it, was to aid in the search for facts by removing the obstacle of witnesses refusing to testify on the ground of self-incrimination, and under the statute the Commission has always endeavored to exercise a sound discretion in this regard. In carrying out the instructions of the Senate in this case the Commission has therefore kept in mind the warning of the Department of Justice to carefully consider before placing a witness upon the stand the effect his testimony might have in the way of immunizing him from criminal prosecution. The Commission has only used such witnesses as seemed necessary to fully answer the Senate's inquiry, and has refrained from calling those witnesses whose evidence, while interesting, might be merely cumulative."

Defendant says that it was believed throughout the investigation that if he testified in obedience to the subpœna, he should and would receive immunity from prosecution on account of the transactions, matters, or things concerning which he would testify to, and he says

that the Commission caused him to believe this way, and that he did believe that he would be protected against any such prosecution and would receive immunity from and against the same; that he testified unwillingly, and in the light and knowledge of the experiences of Hemingway and others, and with a knowledge of the Compulsory Testimony Act of February 11, 1893, and with a knowledge of the threats of the counsel of the Commission of criminal prosecution, if he failed or refused to testify, and with an understanding of the fact that the Commission had exacted from defendants Ledyard and Cuyler express waivers of immunity and express declarations of voluntariness of their testimony.

His plea also sets forth that about April 9, 1914, before testimony was heard upon the reopened investigation, the Attorney General of the United States wrote to the Interstate Commerce Commission and cautioned them of the effect of an examination of persons connected with the New Haven road where subpœnas were issued, and that thereafter, about May 12, 1914, the Attorney General again communicated with the Commission, cautioning them to consider the effect of the examination of certain witnesses upon any criminal prosecution which the government might desire to institute against certain persons for matters connected with the affairs of the New Haven Company. It appears that the letters which passed between the Attorney General and the Commission and the history of the "threat" of counsel for the Commission to Hemingway were reported in the public press and read by the defendant, and that the letters of the Attorney General warned the Commission and advised them that witnesses testifying under oath and in obedience to the subpœna of the Commission, including this defendant, might claim that they thereby became immune from and against prosecution.

Elton says that a number of days before defendant testified before the Commission he had a long personal conference with the counsel for the Commission, and told him of the nature of the testimony which he would give, and that he made the statements to the counsel at the request of counsel for the Commission, and at conferences arranged for and solicited by counsel for the Commission.

Defendant says he went from his home in response to subpœna about May 13, 1914, had conferences with counsel for the Commission, and testified before the Commission under oath concerning the substantial transactions and things alleged in the indictment, charged to constitute a combination to monopolize part of the commerce among the several states of the United States, and that when he testified before the Commission he was fully advised of the declarations made by counsel for the Commission already referred to, to the effect that criminal prosecution would be instituted by the Commission against any person under subpœna from the Commission in the proceeding who should refuse or decline to give testimony.

It is also pleaded that J. W. H. Crim, an attorney at law, acted as counsel for C. S. Mellen, formerly president of the New Haven Company; that Crim was under advice from Mellen to advise all officers and directors of the New Haven Company on matters concerning the

investigation of the affairs of their company, and that defendant relied to a great extent upon Crim protecting the personal rights he (defendant) might have in, or derive from, the investigation; that during the weeks prior to the defendant's testimony Crim held conferences with counsel for the Commission to discuss whether a natural person who should testify before the Commission under oath, in obedience to a subpœna, would receive immunity from criminal prosecution under the acts of Congress on account of the matters and things concerning which such persons should testify, and that Crim and counsel for the Commission conferred and discussed the question of immunity, and that counsel for the Commission often stated to Crim in substance that any person so testifying would secure immunity from criminal prosecution, and that any witnesses who refused to so testify would be indicted by the grand jury for the District of Columbia, and that counsel for the Commission stated to Crim in substance that all persons who might testify under oath and in response to subpœnas would secure immunity from prosecution; that certain persons would be examined, but not under oath, for the reason that the Commission did not desire to grant immunity to such persons, and that the Commission, therefore, called defendant as its witness, without requesting him to waive immunity or warning him that anything to which he might testify would be used against him in any other proceeding; that Crim was present when defendant was sworn and testified, and counsel for the Commission was present, and they had in mind the conferences which had been had, and defendant says the Commission believed then that any natural person testifying under oath would thereby secure immunity, and that said Crim believed that it was intended by counsel for the Commission that immunity should be given.

The plea then concludes with the statement that, in view of the facts set forth, none of the testimony given by defendant upon the investigation referred to was given voluntarily, but was given entirely and wholly under compulsion, and under the threats of the Interstate Commerce Commission of criminal prosecution in the event of his refusal to give such testimony, and that his testimony was in pursuance of an understanding by the Commission and defendant that his testimony would be and was given only under compulsion, and that defendant would be immune from any prosecution for the testimony he gave. Defendant says that he testified fully concerning the things for and on account of which he is now under indictment and being prosecuted. He quotes part of the testimony which he gave, and which shows that at a meeting of the board of directors of the New Haven Company the question of violation of the Sherman Law in consolidation of concerns was considered and discussed. He says that he testified concerning the ownership and operation and participation in matters involved in the offenses charged in the indictment; that when he testified counsel for the Commission knew substantially all of the testimony which he could give; that he is a business man 76 years old, and that he never conferred with counsel or received any advice of counsel during his testimony with respect to any of the matters set forth in the plea.

The government has filed a demurrer, and so raises the broad question of the sufficiency of the plea. It appears that, upon a former indictment against this defendant for the same offense herein charged, defendant set up, as he does here, in bar of the prosecution, immunity which he claimed to have received because of evidence given by him before the Interstate Commerce Commission relating to the transactions which formed the basis of the indictment to which defendant then pleaded. That indictment, however, has been abandoned, and the government is proceeding under a new indictment charging the same offense. Many more facts are set forth in the present plea, but the legal questions which were presented to Judge Grubb are, in the main, the same as those now before the court. The government then, as now, demurred upon these grounds:

(1) That the plea fails to show that the testimony was given pursuant to the requirement by the Interstate Commerce Commission in a proceeding in which the Commission had the power to compel the attendance and testimony of witnesses and the production of documents and for that reason was not given under legal compulsion within the meaning of the immunity statute; and (2) that the witness did not assert his constitutional privilege of declining to answer when sworn before the Interstate Commerce Commission, upon the ground that his answer would tend to incriminate him, and that his answers were not compulsory in the absence of such an assertion of his privilege, and did not earn him the immunity conferred by the statute. The learned judge gave no decision upon the first ground, but did upon the second.

[1] Argument made on behalf of the government is that the inquiry by the Interstate Commerce Commission at which this defendant testified, and which was carried on under an order made pursuant to the Senate resolution heretofore referred to, was beyond the limit of the judicial functions of the Interstate Commerce Commission, and that, notwithstanding the appearance of this defendant under a subpœna before the Commission and the direct inquiry of him into the matters about which he did testify, as set forth in his plea, the proceeding wherein he testified was not one to which the immunity statute applies. The position thus assumed by counsel for the government presents a far-reaching question. The suggestion of it seems irreconcilable with the attitude taken by counsel for the Interstate Commerce Commission, a most important administrative body of the government, when, in May and June, 1914, acting in good faith, the Commission subpœnaed this defendant and had him testify before it concerning attempts to monopolize part of the commerce of the United States, and when counsel for the Commission made the declarations which he did in relation to the position of the Commission toward witnesses there attending or to attend with respect to the affairs of the New Haven Railroad. The Commission, however, is not before the court by its counsel to support the position which it assumed when the proceedings involved were had, and until I have had an opportunity to hear counsel for the Commission I shall harmonize my views with the presumption that the Commission had the power to carry on the hearing as one related to the regulation of commerce between the states, over which

the Commission had general jurisdiction, and I shall hold that the Commission kept within its power in examining this defendant, and that in its investigation it did not go outside of the limits of its authority.

[2] Upon the second ground Judge Grubb decided positively that, by the act of Congress conferring immunity in certain cases (Act Feb. 11, 1893), testimony which had been unavailable under the privilege of silence was made available. The learned judge reasoned that testimony was unavailable under the amendment where the witness showed to the tribunal calling for the testimony that giving it might reasonably tend to incriminate him, and that, inasmuch as such testimony could not be compelled because of the constitutional amendment, Congress was impelled to act, and that the act of Congress referred to could only have been intended to cover testimony which the government was unable to obtain because of a witness declining to answer based upon the incriminating tendency of the testimony and under the protection of the fifth amendment. He ruled that no purpose existed in the mind of Congress to bestow immunity in cases where doing so was not necessary to obtain testimony which could otherwise be refused, and his conclusion was that the Immunity Act was intended only to make available testimony compulsorily given and only to reward the unwilling giver of such evidence, but that evidence given without the assertion of the constitutional privilege, or declined to be given upon any ground other than because of its incriminating tendency, is not compulsory testimony under the fifth amendment and has always been available. Therefore, he reasoned, necessity for conferring immunity on the giver of such testimony not having existed, Congress should not be regarded as having given such immunity, if the language of the statute may be reasonably otherwise construed.

With ability counsel for Elton and other defendants have earnestly urged that it is fundamentally erroneous to say that the fifth amendment to the Constitution applies only to witnesses who may be characterized as unwilling or involuntary ones. They argue that the fifth amendment applies to everybody, and confers the option or privilege of refusing to answer any incriminating question in any court or investigation, and that it is the duty of every court and investigating body to uphold the witness in his assertion of such option or privilege, which is purely personal to the witness. Counsel say that under the immunity statute the promise held out to the witness is one of the things which the witness considers before he answers the question put, and that he waives nothing and makes no election, as he does when he exercises his option or privilege under the fifth amendment. They would distinguish between the fifth amendment, which they say operates the moment that the witness testified, by saying to him that he can refuse to answer if he so desires, and the immunity statute, which refers to the time when the witness is prosecuted for the transaction or thing concerning which he has already testified. No violation, so it is argued, of the immunity statute is made by the government in exacting the answers of the witness, and not until criminal action is brought against the witness for or on account of the transaction concerning which he has testified does the government invade his rights.

The argument along these lines leads them to say that an assertion of the constitutional privilege is an unnecessary condition to the enjoyment of immunity under the immunity statutes referred to, and that, under the statutes in question, an assertion of privilege would be useless. There is a practical view in the question: What does it avail one who asserts the privilege if the statute says he shall answer the question or accept the alternative of being indicted for crime under the provisions of the statute which grants him the immunity he seeks? And, inasmuch as the statute says that he shall be compelled to answer the question, why should he claim his privilege as a condition necessary for the preservation of his constitutional right under the fifth amendment?

We all agree, of course, that a proper construction of the statute demands that it be read as coterminous with the fifth amendment to the Constitution. It may well be that broad construction of the fifth amendment is warrant for sustaining the contentions of the defendant to the effect that the statutory specification of those who shall receive immunity include this defendant and others similarly situated. But, on the other hand, as well pointed out by Judge Grubb, the immunity statute was passed with regard for the construction already put upon the fifth amendment, and in the knowledge that the assertion of the privilege before examination is in itself important, and that, unless the privilege is asserted, the witness will be given no immunity, and, should he testify only after the denial of the privilege, then only can he say that his evidence has been compulsorily furnished, and that, therefore, he is entitled to immunity. Thus, option may rest with the government, and may not be exercised until after the witness has asserted privilege.

Discussion, however, need not here be carried farther. The whole question was argued before Judge Grubb. He had the aid of learned counsel for the defendant and for the government. He gave to the matter full deliberation, has construed the statute in the light of certain expressions of the Supreme Court, and until his decision is reversed or modified by a higher court I shall regard it as a just declaration of the law.

[3] There is, therefore, but this question left: Were the facts and circumstances set forth in the plea in bar as surrounding and connected with the giving of the testimony such that the defendant can now claim that he testified unwillingly and compulsorily, and is therefore fairly entitled to immunity? Without repeating them, it is fairly apparent that the defendant, who was obeying a subpœna, was given to believe that he would be immune if he testified before the Commission, and that, acting under such belief, he gave the vitally important evidence which related to the very transactions upon which the indictment herein is based. The testimony of defendant even went to the extent of positive statements concerning what had been the intention of himself and other directors of the New Haven Company in and about the formation of a transportation monopoly which would violate the provisions of the monopoly statutes of the United States. Defendant had heard the statements of counsel for the Commission warning

persons situated as he was that the Commission intended to proceed criminally against any person testifying under a subpœna and who refused to give his evidence. It is true, as quoted hereinbefore, counsel for the Commission said that procedure under the criminal section of the immunity statutes would be had where the witness refused to testify "without good reason"; but it is fairly to be inferred that in the mind of counsel for the Commission refusal to testify upon the ground of self-incrimination was not considered a good reason, because the statute provided that such a reason, if advanced, would not excuse the witness from testifying.

The plea shows that defendant did not confer with counsel prior to the giving of his testimony. He knew that the Commission had deliberately declined to permit certain other witnesses to be sworn, and that there had been an express requirement that such other witnesses should waive immunity and should make acknowledgment that their statements were being voluntarily given. No advice appears to have been given to this defendant before he was put under oath, nor was he told of his possible waiver of immunity. He was under the actual belief that the Commission intended to give him immunity and that he would receive it.

These and the other things set forth, when considered with due regard to the rights of both the government and of the defendant, show that the purpose of the Commission was to secure the important testimony which this defendant furnished, and was to give immunity to him for giving it. And when the Commission expressly refused such immunity to others, not sworn, they made a whole situation where, by contrast, the belief that this defendant should and would be immune was emphasized; hence, in justice, he may now insist that the power of the government should be stayed as against this prosecution of him for and on account of the transactions concerning which he testified.

The demurrer to the plea is overruled.