### JOHNSON et al. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. April 14, 1925.)

No. 2318.

**1. Criminal law ⊗➞1129(3)—Assignments of error, complaining of exclusion and admission of evidence, without specifying particular evidence involved, held contrary to rules.**

Assignments of error, complaining that court "erred in excluding competent evidence offered," to which the "defendants duly and regularly excepted," and that "court erred in admitting various incompetent, irrelevant, and immaterial evidence offered by the United States" over defendants' objection, "all of which more particularly and at large is shown in the transcript of the testimony," *held* violative of Circuit Court rules.

**2. Grand jury ⊗➞30 — Existence of special term grand jury did not terminate on convening of regular term to which it was continued.**

Legal existence of special term grand jury did not terminate on convening of regular term, where it was continued to such regular term by order of court entered on day preceding it.

**3. Indictment and information ⊗➞121(2)—Application for bill of particulars in prosecution for conspiracy to violate National Prohibition Act held properly denied.**

Denial of application for bill of particulars demanding bill of particulars giving "all the facts and circumstances of the conspiracy" concerning which the government "expects to introduce evidence," "a detailed statement of all overt acts committed, the days and dates when committed, the time and place at which they were committed, and the method and manner in which they were committed," and overt acts "which could have been pleaded therein but were not so pleaded," the "names and post office addresses of all witnesses which the United States will call to testify," and "the facts concerning which each of the said witnesses respectively will testify," *held* proper.

**4. Jury ⊗➞149—Dismissal of panel pending determination of preliminary questions held within sound judicial discretion.**

Where six days had elapsed without commencement of actual trial of defendants because of time consumed in hearing demurrers, motions, pleas in abatement, etc., and 13 jurors originally summoned had been excused because of valid excuses, action of court in dismissing

entire panel on ground that it would be a "needless expense to keep these jurors on pay at the expense of the government for three or four days" during which he would still be occupied in dealing with preliminary questions, *held* within sound judicial discretion.

**5. Criminal law ⬅⬆586—Granting of continuance is in sound discretion of trial court.**

The granting of a continuance is in sound discretion of trial court.

**6. Criminal law ⬅⬆599—Denial of continuance because surprised by government's witnesses held not abuse of discretion.**

Where government, after opening statement, spent more than three weeks in producing its evidence, and during such time thoroughly disclosed its case, and where the only evidence thereafter produced for defendant other than that as to good character was that of witness who sought to impeach credibility of some of government's witnesses, refusal of continuance on ground that defendants were surprised by testimony of government's witnesses was not abuse of discretion, since defendants had ample time in which to meet government's evidence.

**7. Conspiracy ⬅⬆40, 45—Defendants who sold alcohol, illegally removed pursuant to conspiracy, became parties to conspiracy, and evidence of prior events admissible.**

In prosecution for conspiracy to violate National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) by purchase of alcohol from United States for industrial purposes under agreement to denature it before removal, and by removal and sale thereof without denaturing it, persons to whom alcohol was shipped, who sold it with knowledge of the conspiracy, became parties thereto, though not parties at its inception, so that evidence as to what occurred at inception of conspiracy was admissible against them.

**8. Criminal law ⬅⬆721(1)—Remarks of counsel in argument to jury held not references to defendants' failure to take stand.**

Remarks of counsel for government in argument to jury *held* not references to defendants' failure to take stand.

**9. Criminal law ⬅⬆829(1)—Refusal of instructions covered by charge given not error.**

Refusal of instructions covered by charge given *held* not error.

**10. Criminal law ⬅⬆424(3)—Declarations of conspirator, made out of presence of a defendant after termination of conspiracy, not admissible against such defendant.**

Statements or declarations of one conspirator, made out of the presence of a defendant after termination of conspiracy, are not admissible against such defendant.

**11. Criminal law ⬅⬆779—Charge as to acts and declarations of conspirators held not misleading.**

Statements in charge that "acts and declarations of each of the members of the conspiracy are competent and available proof against each other member," and that "they are then partners as in other transactions of life, lawful transactions, each acts for every one, and for all the others," *held* not misleading as against objection that charge permitted jury to consider declarations of one conspirator, made out of presence of another and after termination of conspiracy, admissible against such other, especially where no such declarations had been made after termination.

**12. Criminal law ⬅⬆865(1)—Instructions on sending jury back for further deliberations held not ground for reversal.**

Instructions to jury, on sending it back for further deliberation after extended deliberations without agreement, that absolute certainty could not be expected, that dissenting juror should consider whether his doubt is reasonable one, etc., *held* not ground for reversal.

**13. Criminal law ⬅⬆42—Voluntary statements to government agent, and testimony in prosecution of another, where not incriminating, held not to protect witness from prosecution.**

One who answered questions of government agent investigating violations of National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), and thereafter testified in liquor prosecution of other person, without objection, was not immune from prosecution for conspiracy to violate National Prohibition Act, under Fifth Amendment, where neither such statements nor testimony had slightest tendency to incriminate him, and were not introduced against him in such subsequent prosecution.

**14. Witnesses ⬅⬆297—Witness cannot be compelled to give incriminating testimony.**

A witness cannot be compelled to answer questions which incriminate him, for the very reason that such incrimination may, in the absence of statutory amnesty, result in his subsequent prosecution and conviction.

**15. Criminal law ⬅⬆42—Witness who voluntarily testified in liquor prosecution held not exempt from prosecution under National Prohibition Act.**

Under National Prohibition Act, tit. 2, § 30 (Comp. St. Ann. Supp. 1923, § 10138½q), providing that no person compelled to give incriminating testimony in liquor prosecution shall be "prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing as to which in obedience to a subpœna or under oath he may so testify or produce evidence," defendant, who freely answered questions of government agent investigating liquor prosecution, and testified voluntarily in prosecution of other defendant in obedience to subpœna under oath without knowledge or suspicion that he was in any wise criminally implicated, was not immune from subsequent prosecution for conspiracy to violate Prohibition Act.

In Error to the District Court of the United States for the Northern District of West Virginia, at Wheeling; William E. Baker, Judge.

S. K. Johnson and Albert Eick were convicted of conspiracy to violate the National

Prohibition Act, and they bring error. Affirmed.

J. Bernard Handlan and G. Alan Garden, both of Wheeling, W. Va. (William T. Dixon, of Martins Ferry, Ohio, and Frank A. O'Brien, of Wheeling, W. Va., on the brief), for plaintiffs in error.

Thayer M. McIntire, Sp. Asst. U. S. Atty., of Parkersburg, W. Va. (T. A. Brown, U. S. Atty., of Parkersburg, W. Va., on the brief), for the United States.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The plaintiffs in error S. K. Johnson and Albert Eick, hereinafter called the defendants, together with eight other individuals, were indicted for a conspiracy among themselves, and with others unknown, to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.). Six of the accused pleaded guilty either before the trial began or at various stages of its progress. Two more were acquitted by the jury. The plaintiffs in error were convicted and have brought their case here.

[1] Their assignments of error in form number 24, but in fact, are so expressed as to attack some hundreds of separate rulings of the court below. Thus, one seeks to bring before us the refusal of 43 separate instructions asked for by the defendants. Some of these, it may be said in passing, have reference solely to persons acquitted and have no relation whatever to the case against either of the parties now before the court. Another assignment complains that the court below "erred in excluding competent evidence offered by" the "defendants" "to which action of the court" the "defendants duly and regularly excepted," and another that the "court erred in admitting various incompetent, irrelevant, and immaterial evidence offered by the United States" "over the objection of" the "defendants," "all of which more particularly and at large is shown in the transcript of the testimony." We have not attempted to count how many exceptions there were, but there could scarcely have been fewer than 100. It goes without saying that assignments like these comply neither with the letter nor the spirit of our rules. They are of no assistance in a review of a record which runs up to nearly 800 printed pages. We, however, have read all of it and, without attempting a detailed discussion of the assignments as such, will state with what brevity we may the conclusions to which we have

come upon such of the questions raised as seem to us require any mention whatever.

It will be more convenient to deal with those which relate to both of the defendants first, and afterwards to consider separately one applicable to Johnson alone.

[2] Complaint is made that the indictment was returned by a body of men who were not, in contemplation of law, a grand jury at all. Admittedly, they had legally constituted the grand jury at the special term of the United States court opened at Wheeling on April 24, 1923. The 1st of May was the date fixed by law for the beginning of the regular May term of court. On the preceding day, the 30th of April, the court entered an order that the grand jury "heretofore impaneled and sworn, and not having completed the business before them, and the regular May term of this court convening on to-morrow, on motion of the United States attorney, it is ordered that the said grand jury be, and it hereby is, adjourned and continued until to-morrow morning at 9:30 o'clock, at the regular May term of this court, that they may continue the investigations before them or which may come to their knowledge touching the present service." Without any further action, this grand jury continued to act and returned the indictment in this case on May 8th. The defendants say that upon the convening of the regular term, the special term necessarily came to an end and with it the legal existence of the grand jury which had been impaneled for it. Substantially, the same contention was made and overruled in United States v. Rockefeller (D. C.) 221 F. 462, with the reasoning and conclusions of which we agree.

The defendants say that the learned court below erred in overruling their demurrer to the indictment. In all substantial respects, it was identical in form with that we held sufficient in Martin v. United States, 299 F. 287.

[3] The defendants assign error to the denial of the bill of particulars for which they asked and which demanded, among other things, "all the facts and circumstances of the conspiracy" "giving in detail all dates of any and every transaction concerning which the United States" "intends to offer evidence." "Particular description of that part of the National Prohibition Act which the defendants or any of them are alleged to have conspired to violate." "A full and complete description of all the facts and circumstances and acts concerning which the government expects to introduce evidence," "in its proof of overt acts." "A detailed

statement of all overt acts committed, the days and dates when committed, the time and place at which they were committed and the method and manner in which they were committed." "A full and detailed description of all facts and circumstances concerning which the government intends to offer proof of any and all acts committed by the defendants" "which could have been pleaded therein as overt acts but were not so pleaded." "The names and post office addresses of all witnesses which the United States will call to testify," and "the facts concerning which each of the said witnesses respectively will testify." Such an application obviously went far beyond anything to which the defendants could possibly have been entitled.

[4] The defendants stressed what they charged to have been irregularities in the manner of discharging, selecting, summoning, and impaneling the men from whom the petit jurors who tried them were selected. Sixty jurors originally had been summoned for the special term which was convened on September 20th for the trial of the instant case. Many preliminary questions were raised. There were demurrers, motions, pleas in abatement, etc. The court apparently patiently heard argument on all of them. Six days had elapsed and the case was not yet at issue. In the meantime the court had felt constrained to excuse thirteen of the jurors originally summoned, and the judge said that in the two years and a half there had never been a jury that, to his mind, had so many real and valid excuses. He said there were cases without number in which these excuses were almost mandatory, and that very much against his inclination he had been compelled to say, "Gentlemen, I cannot excuse you." He had gone so far as to say: "Gentlemen, this is a busy time of the year. You will not be detained more than two weeks." It may be added that the verdict was not actually returned until November 9th, more than six weeks after the time at which the court was speaking. The judge mentioned other considerations which made the retention of these particular jurors quite inconvenient. The end of the quarter had come. Under the accounting regulations of the Department of Justice, all the jurors must be paid up. The accounts had to be closed out and a new start made. All this was hard upon the marshal's office unless that official had a little time. The learned judge added, "Now as I see it, it would be a needless expense to keep these jurors on pay at the expense of the government for three or four days," during which he apparently anticipated he would still be occupied in dealing with mere preliminary questions. The entire panel was thereupon discharged. The defendants excepted. Under the circumstances, the action taken by the court was within its sound judicial discretion. We see no reason to think that it was abused. The subsequent action of the court in issuing a new venire followed as a matter of course. The trial of the defendants could only be to a jury and one had to be obtained.

[5, 6] Throughout the course of the case, the defendants moved to strike out the testimony of every government witness on the ground that the defendants were refused the bill of particulars for which they asked, and as a consequence of the insufficient information given by the indictment they were taken by surprise. We have already held there was no error either in sustaining the indictment or in refusing to grant such a bill of particulars as the defendants saw fit to demand. During the examination of each of the government's witnesses, the defendants asked that if the court would not strike out the testimony, it should grant a continuance on the same ground; that is to say, that they were taken by surprise. This request was refused as often as made. The granting of a continuance is in the sound discretion of the trial court. As already stated, we have carefully examined the record in this case. The government made its opening statement on the 4th of October and began the examination of its witnesses the next day, and this continued during every court day up to and through the 29th of October. The record shows that very shortly after the testimony began, the outline of the government's case was thoroughly disclosed. There was ample time for the defendants to have met it if they had seen fit. In point of fact, the only testimony, other than that as to good character, offered on behalf of either of the defendants, was that of Johnson's daughter, who took the stand apparently for the purpose of impeaching the credibility of some of the government witnesses by testifying that he could not have been at a particular place at the time they had sworn he was. We are satisfied that the defendants were not surprised.

[7] The prosecution proved the United States had, at Hermitage, Tenn., a large quantity of alcohol which it advertised for sale for industrial purposes. Before the alcohol could be removed, it was to be denatured by the purchaser. One of the defendants who pleaded guilty was a certain Cecil H. Kearns. He and others of the defend-

ants, not including those now before the court, planned to buy this alcohol, to pretend to denature it without doing so, and to ship it to various cities, Chicago, Toledo, Wheeling, etc., and there dispose of it for beverage purposes. The theory of the government was that Johnson and Eick, knowing its history as that has just been stated, undertook to receive and to dispose of a carload of it in Wheeling and did so. One of the theories of the defense is that the record shows that the conspiracy charged and proved by the government was to ship the alcohol from Tennessee without denaturing it, and that no evidence as to what happened at Wheeling afterwards was material unless the government proved that the defendants had participated in the illegal acts at Hermitage. There is nothing in this contention. The government offered any amount of evidence that the defendants knew all about the alcohol and had undertaken to receive it in Wheeling and to dispose of it illegally there. That they may not have been in the conspiracy at its inception. is immaterial if they became parties to it at any stage of its progress.

What has been already said disposes of the contentions of the defendants that they were entitled to an instructed verdict. If the jury believed the uncontradicted evidence of the government, their guilt was amply proved.

[8] The defendants complain that in argument the counsel for the government called the attention of the jury to the fact that neither of the defendants had seen fit to take the stand in his own behalf. It does not appear that anything of the kind was done. In enumerating the questions that the jury would have to consider, one of the counsel for the government said: "What is the evidence introduced by the government? Does that evidence tend to prove these men guilty beyond a reasonable doubt? What is the defense offered on their behalf?" At another time, he said: "Is there any evidence to show that" (a couple of the government witnesses, naming them) "were not here in the latter part of March or the 1st of April, and that they did not get the alcohol as they were directed? That is one thing upon which there has been no apparent contradictions." Then, again, another one of the counsel for the government said: "I want to call your attention to this opening statement of counsel. And now after the government has presented to you what I think is the strongest case that was ever made out against a man, we have in defense of that only the evidence of the good reputation of some of these defendants." We see in this nothing but a fair

and accurate statement of what had taken place, and there is nothing in the quoted language to sustain the contention that the government in any way called the attention of the jury to the fact that the defendants did not take the stand.

[9] No harm was done to them by the refusal of any of the instructions for which they asked. Everything to which they were entitled was covered in the charge of the court.

[10, 11] Attention is called by them to the fact that the court said that after the jury is satisfied the conspiracy has been formed and exists, "the acts and declarations of each of the members of the conspiracy are competent and are available proof against every other member. They are then partners as in other transactions of life, lawful transactions, each acts for every one and for all the others." The defendants say that this is misleading, in that it did not tell the jury that statements or declarations of one of the conspirators, made out of .the presence of a defendant and after the conspiracy had ended, are not admissible against such defendant. The defendants'. statement of the law is, of course, accurate, but our attention has not been called to the admission of any evidence of any declarations made by one of the conspirators out of the presence of the others after the conspiracy had ended. We have not noticed any in our own examination of the record.

[12] We think it necessary to notice only one other complaint going to the case of both the defendants, and that is as to what the court did and said after the jury had been considering their verdict for some three days. As we understand the record, the jury were not kept together during all of that time. The case was given to them a few minutes before 12 on November 6th. At 12:40 they were apparently allowed to separate for their luncheon, were reconvened at 2 o'clock, were again excused at 5 in the afternoon. They came together again at 10 o'clock on the morning of the 7th. At 12:30 they had an hour and a half recess, were excused at 4:44 in the afternoon until 9:30 the next day, the 8th. On that day, they had the usual noon recess of something like an hour and 20 minutes, and at 5:49 in the afternoon, were brought into court, when the court asked the foreman what, in his opinion, was the probability of agreeing on the verdict if there should be a night session. The foreman answered: "Well, from all indications, the point is just the same as it has been the first minute we went out. I think it will be an

impossibility for the jury to get together." The court then explained to them that they might find all the defendants guilty, or all not guilty, or some guilty or some not guilty, and, in an extreme case, if they could agree as to some of them and not as to the others, they could find a verdict as to those about which they had agreed and report a disagreement as to the others. He then said: "Let me now add, without detracting from what I said in the former charge, the court and jury are here to come to a just and righteous result. No doubt you are as anxious to reach it as I am; so anxious is the court that, having spent five weeks in the trial of this case, I am willing to stay here another week if by that means we are able to reach a just and proper result in this trial. The jury are instructed that in a large proportion of cases absolute certainty cannot be expected, although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusions of his fellows. Yet, you should examine the questions submitted with candor and with a proper regard and deference to the opinions of each other. It is your duty to decide this case if you can conscientiously do so. No juror is expected to do violence to his conscience. You should listen with a disposition to be convinced to each other's arguments. If a much larger number are for conviction, a dissenting juror should consider whether his doubt is a reasonable one which made no impression upon the minds of so many men equally honest and equally intelligent with himself. If, on the other hand, the majority of you are for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority." We see nothing in this language to which any exception can be taken and no need to make any additions to it.

It remains to consider the one assignment applicable to Johnson alone and which involves a question of importance upon which the views of the courts have not been altogether uniform.

It appears from the testimony that the government in some way found out that the alcohol was being shipped without being denatured. Cars of it were seized at various places, and arrests which ultimately culminated in an indictment tried at Dayton, Ohio, were made of various parties, some of whom were subsequently included in the indictment in the instant case. No proceedings at that time had been instituted against either of the defendants now before the court.

In the course of the investigation preparatory to the prosecutions instituted elsewhere, a government agent visited Johnson. Johnson received him pleasantly and told him what, of course, he already knew, that the car of alcohol had come to Wheeling. He added, at the request of the consignees of it, he had taken charge of it and had put it in storage for them. He gave the agent certain delivery tickets, bills, etc., which had been used in connection with the transaction. He said nothing to indicate that he had any knowledge that the alcohol was not denatured or that any improper disposition was to be made of it or, in fact, had been made. He made other statements at the time, which the record would indicate were untrue or were but such half truths as are to a proverb often the most effective instruments of deception. Subsequently at the trial in Dayton of Kearns and others, Johnson was summoned to produce these papers, and he did so and proved their receipt. Although he was examined at some little length, he testified to nothing else of any practical importance. He had freely answered the questions of the agent in the first instance, and he made no objection to testifying at Dayton. Nothing he there said, if true, had the slightest tendency to incriminate him. The government did not, in this case, offer any part of the testimony he there gave, against him.

He claims immunity under section 30 of title 2 of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138½q), which provides that: "No person shall be excused, on the ground that it may tend to incriminate him or subject him to a penalty or forfeiture from attending and testifying, or producing books, papers, documents, and other evidence in obedience to a subpœna of any court in any suit or proceeding based upon or growing out of any alleged violation of this act; but no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing as to which, in obedience to a subpœna and under oath, he may so testify or produce evidence, but no person shall be exempt from prosecution and punishment for perjury committed in so testifying."

[13, 14] His claim that he is immune from prosecution rests upon that statutory provision and upon it alone. He is not protected by the common law as that has been embodied in the Fifth Amendment to the Constitution. United States v. Kimball (C. C.) 117 F. 156; United States v. Price (C. C.)

163 F. 904; United States v. Wetmore (D. C.) 218 F. 227. Indeed, the proposition of law just stated is itself the basis upon which the decision of the Supreme Court in Counselman v. Hitchcock, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110, rests. A witness cannot be compelled to answer questions which incriminate him for the very reason that such incrimination may in the absence of statutory amnesty result in his subsequent prosecution and conviction. We do not have here an attempt to introduce his former testimony in evidence against him. We are therefore not concerned with questions which relate to whether what he once swore to was obtained from him under conditions which would make any confession or admission of his inadmissible against him. Cases similar to that of United States v. Bell (C. C.) 81 F. 830, are therefore not in point.

[15] The one question upon which we are called to pass is whether, under the statutory provision in question, one who has in obedience to a subpœna testified under oath for the government, without making any objection or claim of privilege on his part, is thereby exempted from subsequent prosecution for any phase of the transaction as to which he was interrogated, it not appearing, at the time the government subpœnaed and examined him, that it had any knowledge or suspicion that he was in any wise criminally implicated in the affair. The defendant says it is admitted that he was subpœnaed; that in obedience to its behest, he attended in court, produced the documents it commanded him to bring with him, and testified under oath in a criminal trial against others for a transaction in which the offense with which he is now charged was included or with which, at all events, it was inseparably connected. He insists that he is within both the words and the letter of the statute. The section of the National Prohibition Act above quoted, and upon which he relies, is in itself borrowed, without any intention to change its scope or meaning, from the form given to a series of earlier acts by that of June 30, 1906, 34 Stat. 798 (Comp. St. § 8580), which provided that the immunity given by the previous statutes "shall extend only to a natural person who, in obedience to a subpœna, gives testimony under oath or produces evidence, documentary or otherwise, under oath." Quite clearly this act did only two things and it was intended to do no more. It made it clear that the immunity granted did not inure to the benefit of corporations and that a natural person could not claim it unless he had testified in obedience to a sub-

pœna. It was passed to meet the serious situation which the President and Congress thought had been created by the rulings of Judge Humphreys in United States v. Armour & Co. (D. C.) 142 F. 808. 4 Wigmore on Evidence (2d Ed.) 962; Congressional Record, vol. 40, pp. 7658 and 8739. It was clearly not intended to change the previously existing law in any other respect. As the Supreme Court has said in Heike v. United States, 227 U. S. 131, 33 S. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128, its "obvious purpose * * * is to make evidence available and compulsory that otherwise could not be got." It added, the significant statements, "we see no reason for supposing that the act offered a gratuity to crime." "It should be construed, so far as its words fairly allow the construction, as coterminus with what otherwise would have been the privilege of the person concerned." That privilege would have been to have done either one of two things; to have testified voluntarily or to have refused to testify on the ground of his constitutional privilege. The act was not intended to deal with the cases in which he chose to do the former. Its one object was to meet the situation which arose when the witness elected to claim the right which the Constitution gave him. It was not intended to relieve from the possibility of punishment under other circumstances, or as the Supreme Court said, it did not offer a gratuity to crime.

A construction should not be given to it which would result in a grand jury or prosecuting officer unwittingly conferring immunity upon a serious offender because in the best of good faith, and with no reason to suppose that he was criminally involved in the transaction, he was subpœnaed to produce some documents or to give some testimony which perhaps could just as well have been obtained from other sources. Unquestionably the witness has the constitutional right to object to testifying. Then it is open to the government to elect whether it will or will not proceed with his examination under the statute, but if it does not, his rights remain as they were before he was called to the stand.

We are aware that there are decisions to the contrary, as for example U. S. v. Pardue (D. C.) 294 F. 543, U. S. v. Ward (D. C.) 295 F. 576, and People v. Sharp, 107 N. Y. 427, 14 N. E. 319, 1 Am. St. Rep. 851; but we think the conclusion to which, as above stated, we have come, is based upon what appears to us to be the better reason and is supported by U. S. v. Skinner (D. C.) 218

F. 870, U. S. v. Elton (D. C.) 222 F. 428, U. S. v. Lee (D. C.) 290 F. 517, and if we understand the report correctly, by the majority of the Supreme Court of Wisconsin in State v. Murphy, 128 Wis. 201, 107 N. W. 470. In 4 Wigmore on Evidence (2d Ed.) § 2282, p. 958, the learned author well says: "The anticipatory legislative pardon or immunity is not authorized absolutely but only conditionally upon and in exchange for the relinquishment of the privilege. The Legislature did not intend to give something for nothing, i. e., to give immunity merely in exchange for a testimonial disclosure which it could in any event have gotten by ordinary rules or by the witness' failure to insist on his privilege. The immunity was intended to be given solely as a means of overcoming the obstacle of the privilege; and therefore (irrespective of the precise formality of the judge's procedure) could not come into effect until that obstacle was explicitly presented and thus needed to be overcome."

It follows the judgment below was right and should be affirmed.